SLIP OP. 04-49

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

————————————————————————

|  |  |  |
|---|---|---|
| ELKEM METALS CO., AMERICAN ALLOYS, INC., APPLIED INDUSTRIAL MATERIALS CORP., AND CC METALS & ALLOYS, INC., | : | |
| | : | |
| PLAINTIFFS, | : | |
| | : | |
| AND | : | |
| | : | |
| GLOBE METALLURGICAL, INC., | : | |
| | : | |
| PLAINTIFF-INTERVENOR, | : | |
| | : | |
| V. | : | CONSOL. COURT NO. 99-10-00628 |
| | : | PUBLIC VERSION |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| DEFENDANT, | : | |
| | : | |
| AND | : | |
| | : | |
| FERROATLANTICA DE VENEZUELA, GENERAL MOTORS CORP., ASSOCIAÇÃO BRASILEIRA DOS PRODUCTORES DE FERROLIGAS E DE SILICO METALICO, ET AL., AND RONLY HOLDINGS, LTD., ET AL., | : | |
| | : | |
| DEFENDANT-INTERVENORS. | : | |
| | : | |

————————————————————————

[United States International Trade Commission's Second Remand Determination sustained in part and remanded for further action in conformity with this opinion.]

Dated: May 12, 2004

*Piper Rudnick, LLP* (*William D. Kramer, Martin Schaefermeier*), *Eckert Seamans Cherin & Mellott, LLC* (*Dale Hershey, Mary K. Austin*), and *Howrey Simon Arnold & White, LLP* (*John W. Nields, Jr., Laura S. Shores*) for Plaintiff Elkem Metals Company.

*Williams Montgomery & John, Ltd.* (*Theodore J. Low*) for Plaintiff Applied Industrial

Materials Corporation.

*Arent Fox Kintner Plotkin & Kahn, PLLC* (*George R. Kucik*, *Eugene J. Meigher*, *Stephanie Rigaux*, *James F. Laboe*, *Kate B. Briscoe*), and *Thelen Reid & Priest, LLP* (*Gerald Zingone*) for Plaintiff CC Metals & Alloys, Inc.

*Dangel & Mattchen, LLP* (*Edward T. Dangel, III*, *Michael K. Mattchen*) for Plaintiff-Intervenor Globe Metallurgical, Inc.

*Lyn M. Schlitt*, General Counsel, United States International Trade Commission, *James M. Lyons*, Deputy General Counsel, United States International Trade Commission (*Marc A. Bernstein*) for Defendant.

*Kaye Scholer Fierman Hays & Handler, LLP* (*Julie C. Mendoza*, *Donald B. Cameron*, *R. Will Planert*, *Margaret Scicluna Rudin*) for Defendant-Intervenor Ferroatlantica de Venezuela.

*Hogan & Hartson, LLP* (*Mark S. McConnell*) for Defendant-Intervenor General Motors Corporation.

*Greenberg Traurig, LLP* (*Philippe M. Bruno*) for Defendant-Intervenors Associação Brasileira dos Productores de Ferroligas e de Silico Metalico, Companhia Brasileira Carbureto de Calcio-CBCC, Companhia de Ferroligas de Bahia-FERBASA; Nova Era Silicon S/A, Italmagnesio S/A-Industria e Comercio, Rima Industrial S/A, and Companhia Ferroligas Minas Gerais-Minasligas.

*Aitken Irvin Lewin Berlin & Vrooman, LLP* (*Bruce Aitken*, *Virginie Lecaillon*) for Defendant-Intervenors Ronly Holdings, Ltd., Cheliubinski Electrometalurgical Works, Kuznetsk Ferroalloy Works, Stakhanov Ferroalloy Works, and Zaporozhye Ferroalloy Works.

**OPINION AND ORDER**

EATON, Judge: This case is before the court following remand to the United States International Trade Commission ("ITC"). In *Elkem Metals Co. v. United States*, 27 CIT __, 276 F. Supp. 2d 1296 (2003) ("*Elkem V*"), the court remanded the ITC's negative determination contained in Ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, USITC Pub. 3531, Invs. Nos. 303-TA-23, 731-TA-566–570, and 731-TA-641 (Sept. 2002), List 1, Doc. 606R ("First Remand Determination"). The ITC expressed its views on remand in Ferrosilicon from

Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, USITC Pub. 3627, Invs. Nos. 303-TA-23, 731-TA-566–570, and 731-TA-641 (Sept. 2003), List 1, Doc. 620R ("Second Remand Determination"). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(ii) (2000). For the reasons expressed below, the court sustains the Second Remand Determination in part and remands this matter for further action in conformity with this opinion.

## BACKGROUND

In 1998, the ITC was made aware that during its investigations of ferrosilicon, conducted between January 1989 and June 1993, a price-fixing conspiracy existed among three major domestic ferrosilicon producers, namely, plaintiffs Elkem Metals Co., American Alloys, Inc., and SKW Metals & Alloys, Inc. ("SKW"), the predecessor firm to CC Metals & Alloys, Inc. ("CCMA") (collectively, "Plaintiffs" or "Conspirators").[1] This discovery resulted in the ITC's reconsideration, and ultimate reversal, of the affirmative material injury determinations that it had made in 1993 and 1994. *See* Ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, USITC Pub. 3218, Invs. Nos. 303-TA-23, 731-TA-566–570, and 731-TA-641 (Aug. 1999), List 1, Doc. 558AR ("Reconsideration Determination").[2] Plaintiffs appealed the

---

[1]    The "Original POI" covered the period from January 1989 through June 1993. *See Elkem V*, 27 CIT at __, 276 F. Supp. 2d at 1299. The "Conspiracy Period" is the period from October 1989 through June 1991. *Id*., 27 CIT at __, 276 F. Supp. 2d at 1300. The portion of the Original POI preceding the Conspiracy Period, i.e., the first three quarters of 1989, is referred to as the "Prior Period." The portion of the Original POI following the Conspiracy Period, i.e., from July 1, 1991, to June 30, 1993, is referred to as the "Subsequent Period."

[2]    The Reconsideration Determination contains the negative material injury and

(continued...)

Reconsideration Determination on procedural and substantive grounds.[3]

After addressing the procedural issues presented, the court addressed the merits of

Plaintiffs' challenge in *Elkem V*. There, the court held that the ITC's use of best information

available ("BIA"), under the pre-URAA version of 19 U.S.C. § 1677e(c)[4] was in accordance with

law, and it sustained, as supported by substantial evidence, the finding that declines in domestic

prices between 1989 and 1991 were attributable to the business cycle of ferrosilicon.[5] *Elkem V*,

27 CIT at __, 276 F. Supp. 2d at 1305, 1307–08. The court also held that the ITC's decision to

---

[2](...continued)
threat of material injury determinations that are the subject of this action. The ITC reaffirmed
these negative determinations in subsequent remand proceedings. *See* First Remand
Determination at 1, 23 & n.72; Second Remand Determination at 1, 14 & n.48.

[3]     For a more detailed account of the procedural history and background facts in this
case, see *Elkem V*, 27 CIT __, 276 F. Supp. 2d 1296, 1299–1301 (2003).

[4]     As the petitions in the original investigations were filed before January 1, 1995,
the amendments made by the Uruguay Round Agreements Act were not applicable to the original
determinations. *See Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995). Thus,
on reconsideration the pre-URAA version of 19 U.S.C. § 1677e(c) continued to apply, which
states:

> In making [its] determinations under this subtitle, . . . the
> Commission shall, whenever a party or any other person refuses or
> is unable to produce information requested in a timely manner and
> in the form required, or otherwise significantly impedes an
> investigation, use the best information otherwise available.

19 U.S.C. § 1677e(c) (1988).

[5]     In particular, the ITC discussed evidence in the record concerning declines in
demand and U.S. apparent consumption between 1989 and 1991, which coincided with declines
in domestic prices. *See* First Remand Determination at 26–27.

make adverse inferences was in accordance with law,[6] and it sustained, as supported by substantial evidence, the adverse inference that the conspiracy affected prices during the Conspiracy Period.[7] *Id.*, 27 CIT at __, 276 F. Supp. 2d at 1311. The court further found, however, that substantial evidence did not support the ITC's adverse inference that the price-fixing conspiracy affected prices outside the Conspiracy Period. Accordingly, the court instructed the ITC to

> revisit its finding with respect to the time period outside of the Conspiracy Period. If it should conclude that its findings on remand with respect to this period are justified it shall: (1) state with specificity the evidence that the price-fixing conspiracy affected prices during the entire Original POI; (2) weigh the evidence in the record concerning those portions of the Original POI where the conspiracy was not judicially found to be operative; and (3) explain with specificity what information in the record, if any, supports the adverse inference made on remand that the conspiracy affected prices during the periods preceding and

---

[6]     The court held that "[a]s with BIA, . . . the determinative factor in deciding if the ITC was justified in making an adverse inference with respect to the effect of the price-fixing conspiracy is whether the Conspirators significantly impeded the investigation." *Elkem V*, 27 CIT at __, 276 F. Supp. 2d at 1309 (citing 19 C.F.R. § 207.8).

[7]     The ITC used an underselling analysis to support its adverse inference with respect to the Conspiracy Period. The court found that

> the ITC's underselling finding is supported by substantial evidence on the record. The ITC compared the prices of domestic ferrosilicon charged by the Conspirators with the prices of imported ferrosilicon and observed that during the Conspiracy Period, imports of ferrosilicon undersold the domestic product more frequently than in the months preceding and following the conspiracy. . . . The court finds that the evidence cited by the ITC fairly supports its conclusions with respect to the effect of the conspiracy during the Conspiracy Period based on these comparisons.

*Elkem V*, 27 CIT at __, 276 F. Supp. 2d at 1311.

following the Conspiracy Period.

*Id*., 27 CIT at __, 276 F. Supp. 2d at 1315–16.

In its Second Remand Determination, the ITC revisited its finding that the price-fixing conspiracy affected domestic prices of ferrosilicon outside the Conspiracy Period and modified that finding. *See* Second Remand Determination at 14 ("In our 2002 determination, we found that a significant condition of competition affecting domestic ferrosilicon prices throughout the original periods of investigation was the price fixing conspiracy. . . . [W]e have modified this finding to comply with the CIT's instructions in [*Elkem V*]."). As a result, with respect to the Prior Period, the ITC found that the conspiracy did not affect prices. *Id*. at 14 & n.47. With respect to the Subsequent Period, it found that the conspiracy did affect prices. *Id*. at 14 ("We now find that a significant condition of competition was that the price fixing conspiracy had effects on prices charged by U.S. ferrosilicon producers during the Conspiracy Period and the Subsequent Period.").

In reaching its modified conclusions, the ITC determined that it would use BIA to ascertain how prices were established during the Subsequent Period, reasoning that "[t]he considerations that led the CIT to conclude that '[t]here is little doubt that the use of BIA was warranted under the circumstances presented here,' support[ed] use of BIA" on remand. Second Remand Determination at 7 (quoting *Elkem V*, 27 CIT __, 276 F. Supp. 2d at 1304). The ITC identified two evidentiary bases for its finding that the conspiracy affected prices during the Subsequent Period. Specifically, the ITC considered: (1) its finding "that the conspiracy was a

significant condition of competition affecting prices during the Conspiracy Period," and (2) "the

pricing information in the record." *Id*. at 9.

As to its findings with respect to the Subsequent Period, the ITC recalled the court's

finding in *Elkem V* that substantial evidence supported the adverse inference that the price-fixing

conspiracy affected prices during the Conspiracy Period. *See* Second Remand Determination at

4. The ITC thus "compare[d] the prices that domestic ferrosilicon producers charged during the

latter portion of the Conspiracy Period [where the conspiracy was found to be a significant

condition of competition] with those charged during the Subsequent Period."[8] *Id*. at 9. The

purpose of this comparison was to "examine whether prices for the Subsequent Period solely

reflected market forces and represent the prices the producers would have charged during the

Subsequent Period in the absence of any price-fixing scheme during the Conspiracy Period." *Id*.

In making this comparison, the ITC examined pricing data compiled by the Commission

staff for the last two quarters of the Conspiracy Period and selected quarters of the Subsequent

Period. *See* Second Remand Determination at 9. Upon examination of such data, it concluded

that "there are no significant differences in pricing patterns between the latter part of the

Conspiracy and the Subsequent Period," *id*. at 10, and thus that the effects of the price-fixing

---

[8]     As discussed below, the ITC did not consider data from the entire eight quarters of the Subsequent Period in determining that the conspiracy affected prices during that time. Rather, the ITC variously selected data from the first, second, third, and fourth quarters to support its finding that the conspiracy affected prices during the Subsequent Period. *See* Second Remand Determination at 11–12 (discussing f.o.b. price data for sales made between the third quarter of 1991 and the second quarter of 1992).

conspiracy continued after the conspiracy had ended.[9]

In addition, the ITC found that the volume, price effects, and impact of subject imports were not significant. *See* Second Remand Determination at 14–16. The ITC also adopted the negative threat determination from its First Remand Determination. *See id*. at 14 n.48. Therefore, the ITC reaffirmed its determination that the domestic ferrosilicon industry was neither materially injured, nor threatened with material injury, by reason of imports of ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela.

For the reasons set forth below, the court sustains the ITC's finding that the price-fixing conspiracy did not affect prices during the Prior Period, but does not sustain the finding that the price-fixing conspiracy affected prices during the Subsequent Period, as this finding is not supported by substantial evidence. Thus, the court remands the ITC's findings as to the Subsequent Period and its determinations with respect to the statutory factors in 19 U.S.C. § 1677(7)(C), i.e., volume, price effects, and impact, and 19 U.S.C. § 1677(7)(F), with respect to

---

[9]   In reaching this conclusion, the ITC emphasized that "our finding is not a finding that the conspiracy lasted beyond the Conspiracy Period." Second Remand Determination at 12. The ITC further observed:

> [C]oncluding that the conspiracy did not exist beyond the
> Conspiracy Period does not require us to conclude that the
> conspiracy did not have any further effects on prices. The case law
> indicates that activity in restraint of trade in violation of the
> Sherman Act may have continuing effects after its cessation.

*Id*. at 13 & n.46 (citing *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 557 (8th Cir. 1991); *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 369 (7th Cir. 1990)).

material injury and the threat of material injury, so that the ITC may revisit and clearly explain its findings.

## STANDARD OF REVIEW

When reviewing a final determination in an antidumping or countervailing duty investigation, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "more than a mere scintilla." *Consol. Edison*, 305 U.S. at 229. The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin*, 322 F.3d at 1374 (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

## DISCUSSION

CCMA challenges the Second Remand Determination on both legal and factual grounds. First, CCMA argues that on remand the ITC should have applied legal standards from antitrust law in evaluating the effects of the conspiracy outside the Conspiracy Period, and the ITC's failure to do so was legal error. Second, CCMA argues that the ITC's use of BIA, to find that the conspiracy affected prices during the Subsequent Period, was neither in accordance with law nor

supported by substantial evidence. Third, CCMA argues that the ITC's underselling findings in the First and Second Remand Determinations are factually inconsistent and, thus, unsupported by substantial evidence. Each argument is addressed below.

I.      ***The ITC's Decision To Apply Trade Law, Not Antitrust Law, To Evaluate The Effects Of The Price-Fixing Conspiracy Outside The Conspiracy Period Was Proper***

CCMA claims that on remand the ITC did not apply the proper standard for determining whether the effects of the price-fixing conspiracy continued after the Conspiracy Period. Specifically, CCMA argues for the use of the civil antitrust standard of causation to determine damages. *See* Comments of CCMA on the Second Remand Determinations of the ITC ("CCMA's Comments") at 4. CCMA asserts that under civil antitrust law, "to recover damages for injury incurred after an antitrust conspiracy has ended, a plaintiff must prove that the 'continuing damage [was] directly traceable to the defendants' former unlawful interference," by way of "independent factual proof, not simply by inferences from the prior illegal conduct." *Id*. (quoting *William H. Rankin Co. v. Associated Bill Posters of United States and Canada*, 42 F.2d 152, 155 (2d Cir. 1930), *cert. denied*, 282 U.S. 864 (1930)). CCMA argues that the ITC erred by not "address[ing] the issue of whether the post-conspiracy prices charged by each individual domestic producer somehow perpetuated the past conspiracy or could be directly attributed to it," and, therefore, that the ITC's determination that the conspiracy affected prices during the Subsequent Period "is wrong as a matter of law." *Id*. at 7 (noting ITC did not evaluate Conspirators' "motives" in setting prices during the Subsequent Period).

In response, the ITC argues that it properly applied the antidumping and countervailing duty laws, and asserts that antitrust laws are not controlling as to its inquiry in its remand proceedings. Rebuttal Comments of Def. ITC Supp. Second Remand Determination ("Def.'s Comments") at 12 ("The inquiry the Court directed the ITC to undertake in its second remand – concerning factors affecting prices the domestic ferrosilicon industry charged during portions of the original periods of investigation outside the Conspiracy Period – pertained to the antidumping and countervailing duty laws."). The ITC claims that pursuant to statute, it examined "'factors affecting domestic prices' in determining whether there is material injury by reason of subject imports." *Id*. at 12–13 (quoting 19 U.S.C. § 1677(7)(C)(iii)(III) (1988)). The ITC reiterates that its inquiry involved more than an examination of price levels, "but also of how domestic producers established their prices," and that "whether prices charged by the domestic industry were based on competitive marketplace conditions, or other factors, is clearly pertinent to this statutory inquiry." *Id*. at 13. The ITC further asserts that while it cited antitrust cases in the Second Remand Determination, *see, e.g., supra* note 9, it was for the limited purpose of demonstrating that the effects of price-fixing conspiracies can be felt beyond the time the conspiracy was operative. *See* Def.'s Comments at 16 n.9.

The court finds that the ITC did not commit legal error by failing to apply the civil antitrust law standard of causation in evaluating the effects of the price-fixing conspiracy outside the Conspiracy Period. By statute, Congress set forth the standards that the ITC must apply in evaluating whether a domestic industry is materially injured, or is threatened with material injury,

by reason of imports of subject merchandise.[10] *See* 19 U.S.C. §§ 1673d(b)(1)(A)(i)–(ii), 1677(7).

Nowhere in the statutory scheme governing the ITC's material injury determination did Congress

provide for the application of antitrust law standards of causation. The ITC is, however,

obligated to "evaluate all relevant economic factors which have a bearing on the state of the

industry in the United States . . . ." 19 U.S.C. § 1677(7)(C)(iii). That one of the factors it found

relevant was a price-fixing conspiracy did not, as CCMA contends, trigger any obligation on the

part of the ITC to examine the individual motives of the Conspirators. *See USX Corp. v. United*

*States*, 12 CIT 205, 212, 682 F. Supp. 60, 68 (1988) (noting that in the antidumping statute "there

is neither a scienter requirement . . ., nor evidence in the relevant legislative history that Congress

intended such a requirement."). Thus, the court finds that the ITC did not commit legal error by

failing to apply antitrust standards to determine the effects of the conspiracy outside the

Conspiracy Period.

**II.      *The ITC's Decision To Use Best Information Available Is In Accordance With Law,***
**         *But Its Findings Based On BIA Are Not Supported By Substantial Evidence***

   **A.      *In Accordance With Law***

   CCMA argues that the use of BIA in the Second Remand Determination was improper as

it led to a factually incorrect result. *See* CCMA's Comments at 3. CCMA contends that "[t]here

is simply no evidence in the record to support the idea that the domestic producers submitted

false data to the Commission about their prices and pricing practices during the Prior and

---

[10]      As the court previously stated in *Elkem V*, "the ITC is charged by Congress to administer the trade laws, and make its own findings, by means of its own investigation with respect to material injury." *Elkem V*, 27 CIT __, 276 F. Supp. 2d at 1313 (citing 19 U.S.C. § 1673d(b); *Chung Ling Co. v. United States*, 16 CIT 843, 849, 805 F. Supp. 56, 63 (1992)).

Subsequent Periods." *Id*. at 16 ("Ferrosilicon prices were in fact set by competition during the Subsequent Period, as the industry witnesses uniformly stated . . . ."). CCMA argues that by using BIA "the ITC gave in to the impermissible temptation 'to overreach reality in seeking to maximize deterrence.'" *Id*. at 17 (quoting *F.Lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

The ITC responds that its use of BIA was proper in light of the factual gaps in the record resulting from the unreliable data submitted by the domestic producers. In considering "how it could conduct [its] inquiry for portions of the original period of investigation outside the Conspiracy Period in light of the lack of probative information in the record concerning how producers representing the bulk of domestic production established prices, on the one hand, and the direction of the . . . Court that it have an evidentiary basis for its findings, on the other," the ITC decided to use BIA. Def.'s Comments at 13. According to the ITC, BIA is "a technique specifically authorized by the [antidumping/countervailing duty] statute and one that this Court has already found is appropriate in this case." *Id*. at 14. The ITC urges the court to find reasonable the ITC's use of BIA to fill the factual gaps in the record with respect to the Subsequent Period. *Id*.

The court finds that the ITC's use of BIA in the Second Remand Determination is in accordance with law. CCMA has produced nothing to convince the court that the ITC's conclusions with respect to BIA should be limited to the Conspiracy Period. In *Elkem V*, the court stated:

> There is little doubt that the use of BIA was warranted under the circumstances presented here. No credible argument can be made that the ITC questionnaires were answered truthfully and responsively. It is uncontested that the questionnaires distributed to the domestic producers requested information pertaining to the way in which domestic prices for ferrosilicon were determined. None of the Conspirators revealed the agreement to create a floor price in their questionnaire responses. Rather, "the Commission was told repeatedly that prices in the ferrosilicon market were established solely on the basis of marketplace competition."

*Elkem V*, 27 CIT at __, 276 F. Supp. 2d at 1304–05 (quoting First Remand Determination at 5; footnote omitted). Thus, the ITC's use of BIA was justified under 19 U.S.C. § 1677e(c) because the Conspirators' failure to divulge the existence of the price-fixing conspiracy "significantly impeded" the ITC's investigation. *See id.*, 27 CIT at __, 276 F. Supp. 2d at 1305. CCMA's argument that "[t]here is . . . no evidence in the record to support the idea that the domestic producers submitted false data to the Commission about their prices and pricing practices during the Prior and Subsequent Periods" does not demand a different result. Even if the data submitted by CCMA for the Prior and Subsequent Periods were accurate, this would not relieve CCMA of the ITC's justified finding that its activities significantly impeded the investigation. The questionnaires distributed by the ITC requested information about the domestic producers' pricing decisions, which was directly relevant to the ITC's material injury determination. *See* Reconsideration Determination at 9 ("[B]ecause price is so central an issue in Commission antidumping and countervailing duty investigations, the testimony and written submissions that parties present to the Commission often focus extensively on pricing issues."). The Conspirators' failure to reveal the price-fixing scheme hindered the proper analysis of the conditions of competition in the domestic ferrosilicon industry and any effects dumped and

subsidized ferrosilicon imports may have had on domestic prices. *Id*. at 19 (noting that "the producers concealed, if not manipulated, a competitive issue relevant to the Commission's evaluation of the meaning and significance of the observed market data."). Thus, the ITC's decision to use BIA on remand was proper.

### B.      *Substantial Evidence*

The court next examines whether the ITC's findings in the Second Remand Determination are supported by substantial evidence. First, the court sustains the ITC's finding with respect to the Prior Period, i.e., that "[t]he available information . . . does not support a finding that prices were established in the same manner during the Prior Period as during the Conspiracy Period." Second Remand Determination at 12 n.43. No party disputes the reasonableness of this finding, and there is no evidence that the conspiracy affected prices prior to its existence.

Second, the court finds that substantial evidence does not support the ITC's conclusion that the price-fixing conspiracy affected prices during the Subsequent Period. The ITC based this conclusion on its finding that "there are no significant differences in pricing patterns between the latter part of the Conspiracy Period and the Subsequent Period." Second Remand Determination at 10. The ITC found that the effects of the conspiracy were felt in the Subsequent Period because (1) "there were no sudden shifts in domestic ferrosilicon producers' pricing patterns immediately after the conclusion of the Conspiracy Period," i.e., that there was no price decline immediately following the Conspiracy Period, (2) the existence of long-term contracts "help[ed]

explain the absence of sudden price shifts," (3) there was "no significant shift in the conspirators'

pricing patterns with respect to other domestic producers in the period following the Conspiracy

Period," i.e., the Conspirators "frequently maintained higher prices or failed to match domestic

competitors' price declines in the Subsequent Period," and (4) the underselling data in the record

"[did] not detract" from its conclusion that "domestic ferrosilicon producers' prices during the

Subsequent Period did not reflect competitive marketplace conditions," because "there was not

any significant difference in the incidence of underselling between [the latter part of the

Conspiracy Period and the first two quarters of the Subsequent Period]."[11]  *Id*. at 10–12.  The

court shall examine each of these findings in turn.

### 1.    *No Sudden Shifts In Domestic Ferrosilicon Producers' Pricing Patterns Immediately After The Conclusion Of The Conspiracy Period*

The ITC found that "[t]he data indicate that there were no sudden shifts in domestic

ferrosilicon producers' pricing patterns immediately after the conclusion of the Conspiracy

Period":

> [I]n the third quarter of 1991 (the quarter immediately following
> the last quarter of the Conspiracy Period), prices charged by both
> the conspirators and the domestic industry as a whole were higher
> than those of the immediately preceding quarter.  By contrast, if the

---

[11]    As an initial matter, the court notes that the findings that the ITC made to support its conclusion that the conspiracy affected prices in the Subsequent Period are based on pricing data from selected quarters of the Subsequent Period, not the entire Subsequent Period.  For the first of these findings, with respect to "no sudden shifts" in the domestic producers' pricing patterns, the ITC considered data from the first quarter of the Subsequent Period only.  The third finding, with respect to "no significant shift" in the Conspirators' pricing patterns, was based on data from the first, second, third, and fourth quarters.  The fourth finding, with respect to underselling, was based on data from the first two quarters of the Subsequent Period.  The ITC did not explain its reasons for limiting its analysis in this way.

> effects of the conspiracy on prices were limited solely to the Conspiracy Period, *one would expect an immediate decline* from prices established by a conspiracy, which would be at inflated levels relative to a "true" market price, to prices established by marketplace considerations.

Second Remand Determination at 10 (emphasis added). This finding cannot be sustained as it is not supported by substantial evidence.

By asserting that "one would expect an immediate decline from prices established by a conspiracy," the ITC seems to be saying that the prices charged by both the Conspirators *and non-conspirators* should have been expected, as a result of market forces, to decline following the Conspiracy Period. However, at no point did the ITC endeavor to put this "expectation" in context. That is to say, the ITC neither analyzed factors such as supply and demand that would function to keep prices up or to drive prices down, nor indicated why an immediate drop in prices would be expected in the context of the business cycle or any other existing marketplace conditions, as it is required to do by statute. *See* 19 U.S.C. § 1677(7)(C)(iii) (instructing the ITC to evaluate "all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry."). The ITC's failure to consider the business cycle or marketplace conditions is particularly puzzling considering the importance the ITC attached to these conditions in its analysis in the First Remand Determination.[12] Indeed, it was the ITC's discussion of these conditions that the court found

---

[12]    Previously, the ITC relied on evidence concerning demand trends and U.S. apparent consumption. As noted in *Elkem V*:

> [In the Reconsideration Determination,] [f]irst, the ITC found that

(continued...)

substantiated the ITC's finding, using BIA, that the business cycle was a reason for the drop in

domestic prices during the Conspiracy Period. *Elkem V*, 27 CIT __, 276 F. Supp. 2d at 1306.

Here, the ITC nowhere adequately explained why it was the effects of the conspiracy, and not the

business cycle, that caused the prices charged by "the domestic industry as a whole" to become

elevated. The ITC also failed to indicate the magnitude of the price decline that "one would

---

[12](...continued)
"ferrosilicon prices reached a peak in 1989 when demand was exceptionally high." Second, it found "[d]emand declined significantly from 1990 to 1991 due to a recession that reduced demand for the products in which ferrosilicon was used as an input; consequently, prices fell as well, although only to historically average levels." The ITC thus concluded that these facts "indicate[d] that a reason for the price depression was the business cycle for ferrosilicon," rather than underselling by subject imports.

In the [First] Remand Determination the ITC affirmed these findings, observing that "declines in ferrosilicon prices from 1989 to 1991 largely parallel changes in demand" and that "in 1992, when demand increased somewhat, there were also price increases for some domestically produced ferrosilicon products." The ITC supplemented this demand analysis with an examination of U.S. apparent consumption . . . . It determined that consumption "declined by 5.1 percent from 1989 to 1990 and by 12.4 percent from 1990 to 1991," and that despite increases in consumption between 1991 and 1992 the evidence showed that "the 1992 apparent consumption quantity was still below that of 1989 or 1990." The ITC continued:

> In instances of falling demand, we would generally expect prices to decline. This is particularly true in light of the difficulty in modulating ferrosilicon production to reflect changes in demand. Ferrosilicon is produced in furnaces that must be continuously run and cannot be easily and quickly switched to or from production of other products.

*Elkem V*, 27 CIT __, 276 F. Supp. 2d at 1305–06 (citations omitted).

expect" following the end of the Conspiracy Period. Second Remand Determination at 10.

Without some discussion of what market prices "one would expect," the ITC's statement

amounts to mere conjecture, which is not enough to meet the substantial evidence standard. *See*

*China Nat'l Arts & Crafts Imp. & Exp. Corp. v. United States*, 15 CIT 417, 424, 771 F. Supp.

407, 413 (1991) ("Guesswork is no substitute for substantial evidence in justifying decisions.").

As the ITC's finding is not supported by "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion," the court cannot sustain this finding. *Consol.*

*Edison*, 305 U.S. at 229.


On remand, the ITC shall (1) determine the "'true' market price" the ITC referenced in its

Second Remand Determination at 10, (2) account for the factors it relied upon so heavily in its

prior determinations, e.g., demand and U.S. apparent consumption, (3) clearly explain how these

factors either support or do not support its finding that the conspiracy affected domestic prices in

the Subsequent Period, and (4) evaluate the relevant economic factors it finds to exist in the

marketplace for the entire Subsequent Period, not merely the first quarter of the Subsequent

Period.


### 2. *The Existence Of Long-Term Contracts*

In addition, the ITC found that the existence of quarterly, semiannual, and one-year, i.e.,

long-term, contracts "help[ed] explain the absence of sudden price shifts":

> Most product sold by U.S. ferrosilicon producers was sold pursuant
> to quarterly or semiannual contracts. Additionally, some
> ferrosilicon was sold pursuant to one-year contracts (although, in

these contracts, the price was not necessarily fixed for the entire
year). In light of the existence of such contracts, even if there were
dramatic shifts in producers' pricing behavior – something the
record indicates did not happen – the effects on the market would
not be immediate.

Second Remand Determination at 11 (citation omitted). This finding cannot be sustained as the

ITC did not explain its reasoning.

The ITC seems to have found that the pricing patterns that marked the Conspiracy Period

could be expected to continue into the Subsequent Period, in part because of certain contracts

already in existence at the start of the Subsequent Period. However, the ITC did not state when

these contracts were entered into such that any meaningful price comparison is possible. For

example, the weighted average net f.o.b. selling price for Product 1[13] charged by the Conspirators

in the last quarter of the Conspiracy Period was [[          ]] per pound. *See* Mem. INV-Z-116

(July 22, 2002), List 2, Doc. 797R ("Remand Staff Report"), tbl. III-1. In the first quarter of the

Subsequent Period, the selling price of ferrosilicon charged by the Conspirators was somewhat

higher [[          ]]. *Id*. Non-conspirator AIMCOR's selling price in the first quarter of the

Subsequent Period was [[                    ]]. *Id*. Thus, if a contract were entered into in

the second quarter of 1991, i.e., the last quarter of the Conspiracy Period, it may have tended to

keep prices [[     ]] since a [[      ]] selling price was obtained in the third quarter of 1991,

i.e., the first quarter of the Subsequent Period. In addition, the ITC itself stated that "in these

[one-year] contracts, the price was not necessarily fixed for the entire year," Second Remand

---

[13]     Product 1 is ferrosilicon containing 75% silicon that was sold to U.S. steel
producers.

Determination at 11, thus suggesting that any price lag resulting from these contracts would not extend over the entire Subsequent Period. Without more analysis, the ITC's conclusion that the existence of long-term contracts "helps explain" the absence of shifts in pricing patterns, while plausible, cannot be sustained. *See SEC v. Chenery, Corp.*, 332 U.S. 194, 196 (1947) ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.").

On remand, the ITC shall either demonstrate, by reference to specific record evidence, including specific contract language and the dates the specific contracts were executed and the prices provided for therein, that contracts tended to keep prices up in the Subsequent Period or reconsider its decision to rely on such contracts.

### 3.      *No Significant Shift In The Conspirators' Pricing Patterns With Respect To Other Domestic Producers In The Subsequent Period*

Next, the court examines the ITC's finding that there was "no significant shift in the conspirators' pricing patterns with respect to other domestic producers in the period following the Conspiracy Period." Second Remand Determination at 11. The ITC reasoned:

> In several instances, when prices declined, the conspirators reduced prices less than other domestic producers that were not members of the conspiracy. In other instances, the conspirators maintained prices that were higher than the prices of the other producers. *Whatever the conspirators' individual motives in setting these prices, the fact that they frequently maintained higher prices or failed to match domestic competitors' price declines in the Subsequent Period militates against any finding that the conspirators' prices in the Subsequent Period reflected solely marketplace conditions.*

*Id.* (emphasis added). Thus, the ITC concluded that "prices charged by both the conspirators and the domestic industry as a whole during the Subsequent Period were not the result of competitive marketplace conditions." *Id.* at 12. Here, again, the ITC's analysis falls short.

First, the ITC discounts the possibility that prices charged by the Conspirators and the other domestic producers during the "period following the Conspiracy Period" were "solely" the result of marketplace conditions without engaging in any discussion as to what those marketplace conditions were. Unlike in the First Remand Determination, here, the ITC failed to consider non-price factors, such as demand and U.S. apparent consumption. *See* discussion *supra* Part II.B.1. It is clear from the Remand Staff Report that such factors can affect the price of ferrosilicon. *See* Remand Staff Report at III-1 ("Ferrosilicon prices can fluctuate based on demand factors such as the business cycle and the size of an order, and on supply factors such as the distance shipped, the mode of transportation, inventory levels, and the price of electrical power."). While the ITC conceded that marketplace conditions are important, *see, e.g.*, Def.'s Comments at 13, ("[W]hether prices charged by the domestic industry were based on competitive marketplace conditions, or other factors, is clearly pertinent to this statutory inquiry."), it made no serious effort to determine what they were.

Second, the pricing data support the ITC's finding that the Conspirators' prices, considered in the aggregate, either declined by less or increased by fractions of a penny more than those of other domestic producers, i.e., non-conspirators, during the quarters the ITC chose

to examine, i.e., the first, second, third, and fourth quarters of the Subsequent Period.[14]  It cannot

be said, however, that substantial evidence supports the ITC's finding that the Conspirators

"frequently maintained higher prices" than their non-conspiring domestic competitors during the

Subsequent Period.[15]  The court examines the pricing data in the record for sales of Product 1 and

Product 2.[16]


With respect to Product 1, the data show that the Conspirators' prices, considered in the

aggregate, were [[        ]] than the prices charged by non-conspirator AIMCOR and the

weighted-average price for all reporting domestic producers, i.e., Conspirators and non-

conspirators combined, in every quarter during the Subsequent Period for which data were

represented in the Remand Staff Report, i.e., in the third and fourth quarters of 1991 and the first,

---

[14]        For Product 1, the ITC noted that the Conspirators in the aggregate experienced a
price decline of [[         ]] between the third quarter of 1991 and the first quarter of 1992,
whereas AIMCOR experienced [[      ]] price decline of [[           ]] during that period.  The
ITC went on to note that in the second quarter of 1992, the Conspirators price increased by [[
      ]] from the prior quarter, whereas AIMCOR's price increased by [[          ]] amount, i.e., [[
           ]].  Similar price increases and decreases were noted for Product 2.  *See* Non-Pub.
Second Remand Determination, List 2, Doc. 801R at 12 nn.39, 41.

[15]        With respect to prices charged by non-conspirators during the Subsequent Period,
the ITC examined individual company data for AIMCOR, but not Globe.  *See* Non-Pub. Second
Remand Determination, List 2, Doc. 801R at 12 & n.39; *see* Remand Staff Report, tbls. III-1, -2,
& -3.  Therefore, for purposes of comparing prices charged by non-conspiring companies during
the Subsequent Period and those charged by the individual Conspirators, the court compares
AIMCOR's pricing data with data for each of the Conspirators individually, as reported in
questionnaire responses.

[16]        Product 2 is ferrosilicon containing 50% silicon that was sold to U.S. steel
producers and U.S. iron foundries.

second, and third quarters of 1992.  *See* Remand Staff Report, tbl. III-1.[17]  Similarly, when

disaggregated data for individual companies are considered, they reveal that conspirator

American Alloys [[            ]] non-conspirator AIMCOR[18] from the third quarter of 1991 to the

first quarter of 1992.[19]  Conspirator Elkem Metals [[            ]] AIMCOR in the third and

fourth quarters of 1991.[20]  Conspirator SKW (now CCMA) [[            ]] AIMCOR in the

fourth quarter of 1991 and the first quarter of 1992.[21]  Thus, the available pricing information for

Product 1 does not appear to support the ITC's finding that the Conspirators "frequently

maintained higher prices" than their domestic competitors' prices in the Subsequent Period.

---

[17]     The court notes that the data represented in the Remand Staff Report, which the ITC cited, were compiled from responses to ITC questionnaires.

[18]     AIMCOR reported pricing data for Product 1 sales in the third and fourth quarters of 1991 and the first quarter of 1992.

[19]     American Alloys reported pricing data for Product 1 sales in the third and fourth quarters of 1991 and the first quarter of 1992, which show that American Alloys [[            ]] AIMCOR in each quarter.  For example, in the third quarter of 1991, American Alloys' selling price was [[            ]], and AIMCOR's selling price was [[            ]].  *See* American Alloys' Prod. Ques. Resp., V.A.1; AIMCOR's Prod. Ques. Resp., V.A.1.

[20]     Elkem Metals reported pricing data for Product 1 sales in the third and fourth quarters of 1991.  In the third quarter of 1991, Elkem Metals' selling price was [[            ]], and AIMCOR's selling price was [[            ]].  In the fourth quarter, Elkem Metals' selling price was [[            ]], and AIMCOR's was [[            ]].  *See* Elkem Metals' Prod. Ques. Resp., V.A; AIMCOR's Prod. Ques. Resp., V.A.1.

[21]     SKW reported pricing data for Product 1 sales from the third quarter of 1991 to the third quarter of 1992.  As noted *supra* note 18, similar data for AIMCOR are available for the third and fourth quarters of 1991 and the first quarter of 1992.  While in the third quarter of 1991, SKW's selling price ([[            ]]) was [[            ]] than AIMCOR's ([[            ]]), in the fourth quarter of 1991, SKW's selling price ([[            ]]) was [[            ]] than AIMCOR's ([[            ]]).  In the first quarter of 1992, SKW's selling price ([[            ]]) was again [[            ]] than AIMCOR's ([[            ]]).  *See* SKW's Prod. Ques. Resp., V.A; AIMCOR's Prod. Ques. Resp., V.A.1.

With respect to Product 2, the Conspirators' aggregated data from the quarters considered by the ITC support its finding. The Conspirators' prices, considered in the aggregate, were [[

]] than their non-conspiring domestic competitors' prices in [[          ]] comparisons from the third quarter of 1991 to the third quarter of 1992. *See* Remand Staff Report, tbls. III-2, III-3. However, the data for the individual Conspirators are mixed. Disaggregated data for the individual Conspirators indicate that while conspirator Elkem Metals [[

]] non-conspirator AIMCOR,[22] in sales to both U.S. steel producers and U.S. iron foundries from the third quarter of 1991 to the first quarter of 1992,[23] Conspirators American Alloys[24] and SKW[25] [[          ]] AIMCOR in sales to both steel producers and iron foundries in that

---

[22]     AIMCOR reported pricing data for Product 2 sales in the third and fourth quarters of 1991 and the first quarter of 1992.

[23]     Elkem Metals reported pricing data for Product 2 sales from the third quarter of 1991 to the third quarter of 1992. Elkem Metals' prices were [[          ]] AIMCOR's in the third and fourth quarters of 1991 and the first quarter of 1992. For example, in the third quarter of 1991, Elkem Metals' selling price was [[          ]] in sales to steel producers and [[          ]] in sales to iron foundries. AIMCOR's selling price was [[          ]] for sales to steel producers and [[          ]] in sales to iron foundries. Elkem Metals' Prod. Ques. Resp., V.A at 36, 37; AIMCOR's Prod. Ques. Resp., V.A.1 & V.B.

[24]     American Alloys reported pricing data for Product 2 sales in the third and fourth quarters of 1991 and the first quarter of 1992. The data reveal that American Alloys' prices were [[          ]] than AIMCOR's. For example, in the third quarter of 1991, American Alloys' selling price was [[          ]] in sales to steel producers and [[          ]] in sales to iron foundries. AIMCOR's selling price was [[          ]] in sales to steel producers and [[          ]] in sales to iron foundries. *See* American Alloys' Prod. Ques. Resp., V.A.1 & V.B; AIMCOR's Prod. Ques. Resp., V.A.1 & V.B.

[25]     SKW's questionnaire response contained pricing data for Product 2 sales from the third quarter of 1991 to the third quarter of 1992. According to data contained in SKW's and AIMCOR's responses, SKW's selling price was [[          ]] than AIMCOR's in sales to steel producers in the third and fourth quarters of 1991, but not the first quarter of 1992. In sales to iron foundries, SKW's selling price was [[          ]] than AIMCOR's in the third and fourth

(continued...)

period.

Thus, when available pricing data for Product 1 and Product 2 are considered as a whole, the ITC's finding that the Conspirators frequently maintained higher prices than non-conspiring domestic producers is not supported by substantial evidence. With respect to Product 1, the Conspirators' prices, considered in the aggregate and individually, were [[            ]] than their competitors' prices. With respect to Product 2, the data from the quarters considered by the ITC are, at best, mixed. Thus, the court cannot sustain the ITC's finding that the Conspirators "frequently maintained higher prices" than their non-conspiring domestic competitors.

On remand, the ITC shall revisit its finding that the Conspirators frequently maintained higher prices than their domestic competitors in the Subsequent Period and (1) consider evidence with respect to the non-price factors that existed during the entire Subsequent Period, not only the first, second, third, and fourth quarters of that period, or explain the absence of such evidence in the record and the steps it has taken to account for any missing data, (2) state with specificity the non-price factors it found to exist during the Subsequent Period and explain their relevance to the ITC's finding that the Conspirators frequently maintained higher prices than their domestic competitors, (3) consider data for each of the Conspirators, i.e., disaggregate the pricing data, and either (a) identify sufficient record evidence to support its finding, or (b) reconsider whether the record fairly supports its finding, and (4) state with specificity what difference in price it would

_____

[25](...continued)
quarters of 1991 and the first quarter of 1992. *See* SKW's Prod. Ques. Resp., V.A., at 36, 37; AIMCOR's Prod. Ques. Resp., V.A.1 & V.B.

consider material in the context of this inquiry, and why.

### 4.    *No Significant Difference In The Incidence Of Underselling*

The court next examines the ITC's finding with respect to the incidence of underselling during the Subsequent Period. The ITC found that the underselling data in the record, used in the First Remand Determination to demonstrate that the conspiracy affected domestic prices during the Conspiracy Period, "do not detract" from its finding that "domestic ferrosilicon producers' prices in the Subsequent Period did not reflect competitive marketplace conditions." Second Remand Determination at 12. As noted in *Elkem V*:

> [T]he ITC found that for the Conspirators the frequency of underselling was "significantly higher during the conspiracy period than during the preceding or following period[]":
>
>> For the three conspirators, the frequency of underselling based on delivered prices was 80 percent (24 of 30 comparisons) during the conspiracy period (the fourth quarter of 1989 through the second quarter of 1991) and 61.8 percent (21 of 34 comparisons) during the non-conspiracy period . . . .
>
> The ITC found that the higher incidence of underselling during the Conspiracy Period was "consistent with the theory that the conspiracy would tend to inflate the conspirators' prices as compared to the fair price that would have otherwise been established in the U.S. market during the time of the conspiracy."

*Elkem V*, 27 CIT __, 276 F. Supp. 2d at 1309 (quoting First Remand Determination at 18; citations to the record omitted). In contrast, however, in the Second Remand Determination, the ITC found:

> The subject imports undersold the domestically produced product

> in 5 of 8 comparisons during the last two quarters of the
> Conspiracy Period and 7 out of 9 comparisons during the first two
> quarters of the Subsequent Period. Thus, there was not any
> significant difference in the incidence of underselling between
> these two periods.

Second Remand Determination at 12 (footnotes omitted).[26] Thus, on remand the ITC found that

underselling, for a portion of the Subsequent Period, was even more pronounced than during the

Conspiracy Period.

CCMA contends that "the underselling findings of the [First Remand Determination] are

factually inconsistent with the findings now on appeal." CCMA's Comments at 11. CCMA

converts the underselling comparisons into percentages and argues that they reveal "that the

domestic producers were undersold by the importers 62.5% of the time during the Conspiracy

Period (5 out of 8 sales) and 77.8% of the time during the Subsequent Period (7/9)," and that

"[t]his is the direct opposite of the underselling pattern noted by the ITC in its [First Remand

Determination]." *Id*. at 12. In addition, CCMA contends that the ITC's finding that "there are no

significant differences in pricing patterns between the latter part of the Conspiracy [Period] and

the Subsequent Period," cannot be sustained because "it is based on selective evidence, not on a

weighing of the full pricing record for the Subsequent Period as this Court ordered and the law

requires." *Id*. (citing *Altx, Inc. v. United States*, 25 CIT __, __, 167 F. Supp. 2d 1353, 1363

(2001)).

---

[26]     The ITC claimed that the underselling analysis sustained in *Elkem V* was not
tantamount to a finding that normal market forces were at work outside the Conspiracy Period.
Second Remand Determination at 9.

The ITC urges the court to reject CCMA's arguments. As to CCMA's challenge to the factual basis of the ITC's underselling finding on second remand, the ITC asserts that "[e]ven if . . . the ITC should be estopped from finding the percentage differences between the [latter portion of the Conspiracy Period and the initial portion of the Subsequent Period] not to be significant, this would not call into question the validity of the ITC's underlying finding that prices were not established pursuant to competitive marketplace forces during the Subsequent Period." Def.'s Comments at 27 n.17. The ITC goes on to argue:

> In light of the inferences the ITC made in its [First Remand Determination] concerning the underselling data, [i.e., that the incidence of underselling was higher during the Conspiracy Period,] the only implications that it could draw in finding a significant difference between the incidence of underselling during the latter portion of the Conspiracy Period and the somewhat *greater* incidence of underselling during the initial portion of the Subsequent Period was that the domestic industry's prices were even *less* likely to be established pursuant to competitive marketplace forces in the Subsequent Period than during the Conspiracy Period.

*Id*. (emphasis in original). Thus, the ITC seems to be saying here that the existence of underselling established that the conspiracy was even more effective during the Subsequent Period than during the Conspiracy Period itself.

The court finds that the underselling findings made in the First and Second Remand Determinations are not necessarily factually inconsistent with each other because the ITC looked at different time periods in making those findings. In the First Remand Determination, the ITC compared underselling data for the Conspiracy Period with data from the quarters preceding and

following that period[27] to arrive at its conclusion that the frequency of underselling was

"significantly higher" during the Conspiracy Period. In the Second Remand Determination, the

ITC determined that there was no "significant difference" in the incidence of underselling by

focusing on the last two quarters of the Conspiracy Period and the first two quarters of the

Subsequent Period. It may be the case that the incidence of underselling was not significantly

different in those time periods, while, on the whole, the incidence of underselling was

significantly higher during the Conspiracy Period than during the Prior and Subsequent Periods

combined. Thus, CCMA's argument, in this respect, is unpersuasive.

However, the court agrees with CCMA that the ITC did not consider the full record in

making its underselling finding. The ITC evaluated data from the last two quarters of the

Conspiracy Period, i.e., January through June 1991, and the first two quarters of the Subsequent

Period, i.e., July through December 1991. That is to say, the ITC examined neither the entire

Conspiracy Period nor the entire Subsequent Period. Moreover, there is no evidence that data

from the initial two quarters of the Subsequent Period were probative of what, if any, effect the

conspiracy might have had on domestic prices during the remainder of that period. The Remand

Staff Report contains data covering the first quarter of 1989 through the third quarter of 1992,[28]

---

27      In the First Remand Determination, the ITC made comparisons based on data contained in the Remand Staff Report, which covers January 1989 through October 1992. Therefore, the ITC had before it data for the entire Prior Period, but not the entire Subsequent Period. *See* First Remand Determination at 18 n.57 (citing tbls. III-1–6, III-7a–c, III-8a–c, III-9a–b).

28      The remaining portion of the Subsequent Period, i.e., the fourth quarter of 1992 through the second quarter of 1993 is unaccounted for. This may be because the data collected

(continued...)

yet the ITC did not consider data from any quarter after the fourth quarter of 1991. It must

account for the entire Subsequent Period on remand.

The underselling analysis in the First Remand Determination was arrived at using both

the device of adverse inferences and by direct evidence relating to the incidence of underselling.

The ITC used underselling to demonstrate that domestic prices were affected by the conspiracy

during the Conspiracy Period. *See Elkem V*, 27 CIT __, 276 F. Supp. 2d at 1309. The evidence

cited to prove that the conspiracy affected prices during the Conspiracy Period, however, tends to

support the proposition that the conspiracy did not affect prices during either the Prior Period or

the Subsequent Period. The ITC's attempts to diminish the importance of this evidence and the

conclusions it previously drew from such evidence are unavailing:

> [P]rices the domestic industry charged *vis a vis* the subject imports
> were inflated during the Conspiracy Period relative to other
> portions of the original periods of investigation. While the analysis
> could also support an inference that the effects of the conspiracy on
> prices were greatest during the Conspiracy Period, it does not
> necessarily follow from this that the conspiracy had no effects
> during other periods. To make such a conclusion, the Commission
> would first need to have quantified the effects the conspiracy had
> on prices. The Commission was not required by either the statute
> or [*Elkem V*] to engage in such an exercise, and it did not attempt
> to do so.

---

[28](...continued)
for that period of time are incompatible with the data collected for the other portions of the
Original POI, as counsel for the ITC contends, but nowhere did the Commissioners themselves
offer that as a reason why they did not consider data encompassing the entire Subsequent Period.
*See* Def.'s Comments at 18 (quoting Remand Staff Report at III-1 n.1). "The courts may not
accept appellate counsel's *post hoc* rationalizations for agency action . . . . For the courts to
substitute their or counsel's discretion for that of the [agency] is incompatible with the orderly
functioning of the process of judicial review." *See Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156, 168–69 (1962) (quoting *Chenery*, 332 U.S. at 196).

Second Remand Determination at 8–9 (footnote omitted). While it is true that the ITC was not explicitly obliged to go through the exercise of quantifying the effects the conspiracy had on prices during the Subsequent Period in order to find that the conspiracy affected prices during that time frame, it may well be that the demands of substantial evidence indicate its necessity in light of its previous findings. Should the ITC hope to establish by substantial evidence that the conspiracy affected prices during the Subsequent Period, a baseline would be useful.

The ITC was obliged to cite substantial evidence demonstrating its claim that the conspiracy affected prices in the Subsequent Period. On remand, the ITC shall, taking into account data from the entire Subsequent Period, determine whether the record fairly supports the ITC's finding that there was "no significant difference" in the incidence of underselling during the Conspiracy Period and the Subsequent Period, and cite the specific record evidence, if any, that supports such a finding. In addition, it shall state with specificity why its findings are not at odds with a finding that underselling tended to establish that the conspiracy affected prices during the Conspiracy Period.

## CONCLUSION

In light of the foregoing, the court sustains the ITC's finding with respect to the Prior Period, but not with respect to the Subsequent Period, as the latter is not supported by substantial evidence. That is, the ITC failed to support its findings with "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 229. While it is the duty of the ITC to weigh the evidence, *see Altx*, 25 CIT at __, 167 F. Supp.

2d at 1361 n.9, and draw reasonable inferences therefrom, *see Corus Staal BV v. United States Int'l Trade Comm'n*, 27 CIT __, __, slip op. 03-02 (Mar. 21, 2003), *aff'd without opinion*, 85 Fed. Appx. 772 (Fed. Cir. 2004), it may not reach its conclusions based on mere surmise. *See China Nat'l*, 15 CIT at 424, 771 F. Supp. at 413. Here, the ITC has not supported all of its conclusions with substantial evidence. Thus, the court remands the ITC's conclusion that the conspiracy affected prices during the Subsequent Period for consideration by the ITC in accordance with this opinion. Upon consideration of the issues discussed herein, the ITC shall also revisit its findings with respect to volume, price effects, impact, and the statutory threat factors and state each of its conclusions clearly and with citations to the specific record evidence that it finds supports those conclusions. Such remand results are due within ninety days of the date of this opinion, comments are due thirty days thereafter, and replies to such comments eleven days from their filing.

     /s/ Richard K. Eaton     
Richard K. Eaton, Judge

Dated: May 12, 2004
      New York, New York