Slip Op. 06-108

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                        :
ELKEM METALS CO., APPLIED               :
INDUSTRIAL MATERIALS CORP., AND         :
CC METALS & ALLOYS, INC.,               :   Before: Richard K. Eaton,
                                        :   Judge
                                        :
            Plaintiffs,                 :
                                        :   Consol. Court No. 99-00628
      v.                                :
                                        :
UNITED STATES,                          :
                                        :
            Defendant.                  :
_____ :
```

MEMORANDUM OPINION AND ORDER

[United States International Trade Commission's Third Remand Results remanded]

Dated: July 21, 2006

*DLA Piper Rudnick Gray Cary US, LLP* (*William D. Kramer, Martin Schaefermeier,* and *Clifford E. Stevens, Jr.*), *Eckert Seamans Cherin & Mellott, LLC* (*Dale Hershey*)*,* and *Howrey Simon Arnold & White, LLP* (*John W. Nields, Jr.* and *Laura S. Shores*), for plaintiff Elkem Metals Co.

*Williams Montgomery & John, Ltd.* (*Theodore J. Low*)*,* for plaintiff Applied Industrial Materials Corp.

*Arent Fox Kintner Plotkin & Kahn, PLLC* (*Eugene J. Meigher, Matthew Kanna,* and *George R. Kucik*), for plaintiff CC Metals & Alloys, Inc.

*Dangel & Mattchen, LLP* (*Edward T. Dangel, III*), for plaintiff-intervenor Globe Metallurgical, Inc.

*Lyn M. Schlitt*, General Counsel, United States International Trade Commission, *James M. Lyons*, Deputy General Counsel, United States International Trade Commission (*Marc A. Bernstein*), for

defendant.

   *Kaye Scholer, LLP* (*Julie C. Mendoza*), for defendant-intervenor Ferroatlantica de Venezuela.

   *Hogan & Hartson, LLP* (*Mark S. McConnell*), for defendant-intervenor General Motors Corp.

   *Greenberg Traurig, LLP* (*Philippe M. Bruno*), for defendant-intervenors Associao Brasileira dos Productores de Ferroligas e de Silico Metalico, Companhia Brasileira & Companhia Ferroligas, Nova Era Silicon S/A, Italmagnesio S/A-Industria e Comercio, Rima Industrial S/A, and Companhia Ferroligas Minas Gerais - Minasligas.

   Eaton, Judge:  This matter is before the court following remand to the United States International Trade Commission ("ITC" or the "Commission") of its negative injury determination contained in Ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, Invs. Nos. 303-TA-23, 731-TA-566-570, and 731-TA-641 (Final) (Reconsideration) (Second Remand), USITC Pub. 3627 (Sept. 2003) ("Second Remand Determination").  *See Elkem Metals Co. v. United States*, 28 CIT __, slip op. 04-49 (May 12, 2004) (not published in the Federal Supplement) ("*Elkem VI*"), *as modified by, Elkem Metals Co. v. United States*, 28 CIT __, slip op. 04-152 (Dec. 3, 2004) (not published in the Federal Supplement) ("*Elkem VII*").  Pursuant to remand, the Commission has again issued a determination in Ferrosilicon from Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, Invs. Nos. 303-TA-23, 731-TA-566-570, and 731-TA-641 (Final)

(Reconsideration) (Third Remand), USITC Pub. 3765 (Mar. 2005)

("Third Remand Determination"), and again found that the U.S.

ferrosilicon industry was not injured as a result of ferrosilicon

imports.  Plaintiffs now challenge the results of the Third

Remand Determination.  The court has jurisdiction pursuant to 28

U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(ii)

(2000).  For the reasons set forth below, the court remands the

Third Remand Determination to the ITC for further consideration.


                              BACKGROUND

    Familiarity with the facts of this dispute is presumed.  For

purposes of this opinion, the following history is noted.  In

*Elkem VI*, the court considered whether an established price-

fixing Conspiracy[1] was a significant condition of competition

that had affected prices charged by U.S. ferrosilicon producers

during: (1) the period preceding the Conspiracy, i.e., the first

three quarters of 1989 ("Prior Period"); (2) the period of the

Conspiracy itself, i.e., the period from late-1989 through mid-

1991 ("Conspiracy Period"); and (3) the period subsequent to the

end of the Conspiracy, i.e., the period from mid-1991 to mid-1993

("Subsequent Period").  *See Elkem VI*, 28 CIT at __, slip op. 04-

---

[1]    The Conspirators were plaintiffs Elkem Metals Co.,
American Alloys, Inc., and SKW Metals & Alloys, Inc., the
predecessor firm to CC Metals & Alloys, Inc. (collectively,
"Conspirators" or "plaintiffs").  *See Elkem Metals Co. v. United
States*, 27 CIT __, 276 F. Supp. 2d 1296, 1300 (2003) ("*Elkem V*").

49 at 3 n.1.  There, the court "sustain[ed] the ITC's finding

that the price-fixing [C]onspiracy did not affect prices during

the Prior Period"[2] and remanded, as unsupported by substantial

evidence, the Commission's finding that the price-fixing

Conspiracy affected prices during the Subsequent Period.  *Id*. at

8.


     In *Elkem VII*, the court addressed the ITC's motion seeking

reconsideration of its holding in *Elkem VI* that substantial

evidence did not support the Commission's finding that the price-

fixing Conspiracy affected prices during the Subsequent Period.

*See Elkem VII*, 28 CIT at __, slip op. 04-152 at 3.  By its

motion, the ITC asserted that the court erred because "[s]everal

of the remand instructions . . . appear[ed] to require the

Commission to engage in inquiries that do not reflect the

requirements of the antidumping and countervailing duty laws."

Mot. of Def. ITC for Reconsideration ("Def.'s Mot.") at 5; *see*

---

[2]     The court sustained the finding that the price-fixing
Conspiracy was a significant condition of competition that
affected prices during the Conspiracy Period, *see Elkem V*, 27 CIT
at __, 276 F. Supp. 2d at 1313; and, following remand, that the
price-fixing Conspiracy was not a significant condition of
competition during the Prior Period, *see Elkem VI*, 28 CIT at __,
slip op. 04-49 at 8.  Although the Conspiracy was not a
significant condition of competition during the Prior Period, the
ITC concluded that "[t]he available pricing data for the Prior
Period do not detract from [the negative injury determination],
because they show predominant overselling."  Second Remand
Determination at 17 (footnote omitted).

*also Elkem VII*, 28 CIT at __, slip op. 04-152 at 3-4.  The court treated the Commission's motion as one for modification and clarification rather than reconsideration because, while the ITC's arguments did not establish that the court's decision was "manifestly erroneous," they were meritorious in some respects. *See Elkem VII*, 28 CIT at __, slip op. 04-152 at 3.

The ITC first objected to the remand instruction from *Elkem VI* that required it to quantify its findings by determining the "true" market price of ferrosilicon.[3]  *See Elkem VI*, 28 CIT at __, slip op. 04-49 at 19.  The need to instruct the ITC to quantify its findings arose after the Commission introduced, in the Second Remand Determination,[4] the notion that prices in the Subsequent Period exceeded the "true market price."  *See* Second Remand Determination at 11.  The ITC used the construct "true

---

[3]    This instruction provided that: "On remand, the ITC shall (1) determine the true market price the ITC referenced in its Second Remand Determination at 10 . . . ." *Elkem VI*, 28 CIT at __, slip op. 04-49 at 19 (internal quotation marks omitted).

[4]    In the Second Remand Determination, the ITC stated that:

> By contrast, if the effects of the [C]onspiracy on prices were limited solely to the Conspiracy Period, one would expect an immediate decline from prices established by a [C]onspiracy, which would be at inflated levels relative to a "true" market price, to prices established by marketplace considerations.

Second Remand Determination at 11.

market price" to substantiate its conclusion that the

[C]onspiracy affected prices beyond the Conspiracy Period.  *Id.*

According to the ITC, the antidumping and countervailing duty

laws did not require it to determine a "true market price."  *See*

*Elkem VII*, 28 CIT at __, slip op. 04-152 at 10.  The court

acknowledged the possibility for the ITC to make findings based

on "true market price" that would be supported by substantial

evidence without quantifying the actual price itself, but

emphasized that, if the ITC wished to continue using the term

"true market price," it had to define the term and provide

substantial evidence supporting any findings that were based on

its use.  *Id.* at 13.  As a result, the court modified the remand

instructions regarding "true market price" as follows:

> Should it continue to rely on the term "true market
> price," the ITC shall (1) define the term "true market
> price" it referenced in its Second Remand Determination
> at 10, and provide substantial evidence supporting any
> findings it makes regarding price changes that should
> have occurred in the absence of continued effects from
> the [C]onspiracy, including any findings based on the
> use of the term "true market price," but is not
> required to provide a quantification of that term; (2)
> account for the factors it relied upon so heavily in
> its prior determinations, e.g., demand and U.S.
> apparent consumption; (3) clearly explain how these
> factors either support or do not support its finding
> that the [C]onspiracy affected domestic prices in the
> Subsequent Period; and (4) evaluate the relevant
> economic factors it finds to exist in the marketplace
> for the entire Subsequent Period, not merely the first
> quarter of the Subsequent Period.

*Id.*

The ITC further asserted that it should not be required on remand to "state with specificity what difference in price it would consider material in the context of this inquiry, and why."[5] *Elkem VI*, 28 CIT at __, slip op. 04-49 at 26-27. Rather than reconsidering its instruction, the court clarified that the ITC could, if it so desired, comply with the instruction by substituting the word "significant" for "material" because the court's instructions were designed to show what price differential between the Conspiracy Period and Subsequent Period would be significant enough to demonstrate that the Conspiracy affected prices in the Subsequent Period. *See Elkem VII*, 28 CIT at __, slip op. 04-152 at 15.

The Commission next contested the court's instruction that, "[s]hould the ITC hope to establish by substantial evidence that the [C]onspiracy affected prices during the Subsequent Period, a baseline [price] would be useful." *Elkem VI*, 28 CIT at __, slip op. 04-49 at 32. The court clarified that its suggestion to

---

[5]     This instruction resulted from the ITC's finding that there was "no significant shift in the [C]onspirators' pricing patterns with respect to other domestic producers in the period following the Conspiracy Period," and "prices charged by both the [C]onspirators and the domestic industry as a whole during the Subsequent Period were not the result of competitive marketplace conditions." Second Remand Determination at 11, 13.

include a baseline price was merely "guidance from the court as to the type of evidence that might be useful in order to satisfy the demands of substantial evidence. . .," and not a remand instruction. *Elkem VII*, 28 CIT at __, slip op. 04-152 at 16.

Finally, the ITC asserted that the court's instruction to disaggregate the pricing data for each of the Conspirators is not required by antidumping or countervailing duty laws. *See* Def.'s Mot. at 7. The court found this contention to have some merit, and therefore amended the remand instruction to read as follows:

> (3) in revisiting its finding that the Conspirators frequently maintained higher prices than their domestic competitors during the Subsequent Period, [the ITC should] consider the data for each of the Conspirators and either (a) disaggregate the pricing data or (b) explain why its method of aggregating the data is reasonable considering the court's discussion of that data, and, in any event, identify sufficient record evidence to support its finding, and explain how that evidence supports its finding.

*Elkem VII*, 28 CIT at __, slip op. 04-152 at 17.

Following the issuance of the court's order modifying the remand instructions, the ITC issued its Third Remand Determination. Rather than directly complying with the court's remand instructions, however, the ITC has instead redirected its efforts toward disproving Elkem's assertion that, "absent

evidence to the contrary, the Commission should presume that

ferrosilicon prices during the Subsequent Period were established

pursuant to marketplace forces because ferrosilicon is a

commodity product sold by numerous suppliers pursuant to

competitive bidding."  Third Remand Determination at 9.

Specifically, the Commission states that:

> [W]e have not attempted to make an affirmative showing
> that the [C]onspiracy affected prices during the
> Subsequent Period.  To comply with the CIT's decision,
> our finding instead concentrates solely on what the
> record does *not* show – namely, that prices during the
> Subsequent Period were established in a different
> manner, <u>i.e.,</u> solely pursuant to marketplace forces,
> than prices for the Conspiracy Period.

Third Remand Determination at 19 (emphasis in original).  In so

doing, the ITC abandoned its finding in the Second Remand

Determination that, "a significant condition of competition was

that the price-fixing [C]onspiracy had effects on prices charged

by U.S. ferrosilicon producers during . . . the Subsequent

Period."  Second Remand Determination at 15.


    Now before the court are the ITC's conclusions contained in

the Third Remand Determination.  Here, the Commission first

provides a "modified analysis of subject import volume, price

effects, and impact once it stated it was unable on third remand

to find that the [C]onspiracy affected prices during the

Subsequent Period." Defendant's Rebuttal Comments on Third

Remand Determination ("Def.'s Comments") at 11; *see also* Third

Remand Determination at 22. The ITC found that "the record

cannot support any conclusion on how prices were established

during that period, including a conclusion that prices were

solely the result of marketplace forces." Third Remand

Determination at 22. This led the ITC to find, based on what the

record did not show, that the likely volume, price effects, and

impact of subject imports on the domestic industry were not

significant. *Id.* at 24-28.


With regard to the likely volume of subject imports, the ITC

found that the 1992 increase in volume that occurred during the

Subsequent Period was not significant because:

> [W]hile we have not made a finding that the
> [C]onspiracy affected prices charged by domestic
> ferrosilicon producers during the Subsequent Period, we
> have concluded, based on [Best Information Available
> ("BIA")], that the record indicates no significant
> change in pricing patterns between the Conspiracy
> Period and the Subsequent Period. In light of this,
> the record cannot support a finding that the pricing
> data in the record for the Subsequent Period reflect
> prices determined exclusively pursuant to marketplace
> conditions. We therefore cannot find the requisite
> causal link between this increase in the subject
> imports and the declines in the condition of the
> domestic industry . . . .

Third Remand Determination at 23. The ITC further stated that:

The lack of reliable information for the Conspiracy Period, or for the full period of investigation that the Commission would typically examine, impairs our ability to assess the significance of changes, such as those in subject import volume, between the Conspiracy Period and the Subsequent Period.

*Id.*

In addition, the ITC concluded that the likely price effects

of subject imports were not significant:

Because there is no finding that the domestic industry pricing data for the Subsequent Period reflect prices at market levels, we cannot find this data – or any other pricing data in the record – probative for an analysis of underselling during the period.  We consequently lack a sufficient evidentiary basis to conclude that any underselling is significant.

*Id.* at 25.

The ITC went on to hypothesize, *see* Third Remand

Determination at 25, that if the pricing data for the Prior

Period and the Subsequent Period *did* reflect competitive

marketplace conditions, the

usable underselling observations from the Prior Period and the Subsequent Period would still account for a minority of all price comparisons during the entire period for which we have consistently-generated pricing data.  The significance of this relatively small proportion of underselling is diminished further by the fact that ferrosilicon is a commodity product, for which we would ordinarily expect to see some degree of underselling of the domestically-produced product by products from other sources.

*Id*. at 25-26.

As a result, the ITC found that the likely impact of subject imports on the domestic industry was not significant:

> Because the 1991 data are not a probative baseline for competitive market conditions, and there is no reliable information in the record concerning what the CIT has acknowledged is a central condition of competition, the record permits us to do no more than observe that domestic industry performance declined concurrently with increases in subject import volume.  The record does not permit us to ascertain whether there is a causal link between the subject imports and the industry declines.  Absent such a causal link, we are not authorized to make an affirmative determination of material injury by reason of subject imports.

*Id*. at 27.

The ITC justified its analysis by contending that the court "found in *Elkem V* that the Commission was entitled to use BIA and take adverse inferences in this proceeding because . . . the Conspirators . . . 'significantly impeded' its investigation within the meaning of 19 U.S.C. § 1677e(c)."  *Id*. at 7-8; *see also Elkem Metals Co. v. United States*, 27 CIT __, 276 F. Supp. 2d 1296, 1305 (2003) ("*Elkem V*").  For the ITC, a "principal justification for the BIA rule is to avoid rewarding the uncooperative and recalcitrant party for its failure to supply requested information."  Third Remand Determination at 10

(internal quotation marks omitted).  In addition, the ITC failed to comply with the court's instruction to provide an independent evidentiary basis for any conclusion based on BIA because in its view, "absent conducting a separate investigation to obtain the missing data – something the BIA provision is intended to avoid – the Commission will not typically have ready reference to factual material that could provide independent evidentiary corroboration for use of an adverse inference."  *Id*. at 21 n.72.

Plaintiffs now challenge the Third Remand Determination on the grounds that the Commission failed to support its findings with substantial evidence.  *See* Comments of CC Metals and Alloys, Inc. On The Third Remand Determinations of the ITC ("CCMA Comments") at 3; Elkem Comments on ITC Third Remand Determination ("Elkem Comments") at 9.  Plaintiffs further assert that, because the Commission conceded that the record lacks substantial evidence indicating that subject imports had an adverse pricing impact during the Subsequent Period, the "ITC shifted the grounds of decision onto a purportedly 'new' theory. . ." of focusing on an adverse inference, i.e., what the record does *not* show.  CCMA Comments at 9; *see also* Elkem Comments at 4.  In other words, plaintiffs posit that there is no evidentiary basis for the Commission's adverse inference that the Conspiracy, or some other

force, prevented domestic prices from being set by the market in the Subsequent Period.

STANDARD OF REVIEW

When reviewing the ITC's final injury determination in an antidumping or countervailing duty investigation, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence requires more than a mere scintilla, but is satisfied by something less than the weight of the evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (internal citation and quotation marks omitted).  The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin*, 322 F.3d at 1374 (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

DISCUSSION

The court has held in previous opinions that the ITC's "use of BIA . . . is in accordance with law," and that "[plaintiffs] ha[ve] produced nothing to convince the court that the ITC's conclusions with respect to BIA should be limited to the Conspiracy Period." *Elkem VI*, 28 CIT at __, slip op. 04-49 at 13. Nevertheless, the court may "hold unlawful the [ITC's] final determination if it is unsupported by substantial evidence on the record or otherwise not in accordance with law." *Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000). Accordingly, the court has repeatedly held that "substantial evidence [does] not support the ITC's adverse inference that the price-fixing [C]onspiracy affected prices outside the Conspiracy Period." *Elkem VI*, 28 CIT at __, slip op. 04-49 at 5; *see also Elkem VII*, 28 CIT at __, slip op. 04-152 at 6. The court stated in *Elkem V* that:

> It does not appear that the ITC had a sound rationale
> in making the adverse inference that the [C]onspiracy
> affected prices during the entire Original [Period of
> Investigation], and not just during the period in which
> the [C]onspiracy was actually in effect. . . .  While
> the ITC may justifiably conclude that the "failure [to
> reveal the [C]onspiracy] gives rise to an inference
> that the evidence is unfavorable to" Plaintiffs, it may
> not use the inference to reach a conclusion that
> appears to be at odds with the known facts, and an
> attempt to do so on the part of the ITC cannot be said
> to be supported by substantial evidence on the record.

*Elkem V*, 27 CIT at __, 276 F. Supp. 2d at 1315 (internal citation omitted).

The ITC claims that in the Third Remand Determination, it abandoned its previous conclusion that the Conspiracy affected prices in the Subsequent Period.  Even so, the ITC appears to be attempting by way of an adverse inference to reach the same conclusion.  That is, if the prices in the Subsequent Period were not set solely by the market, it follows that they must have been affected by the Conspiracy or by some other unstated force.  *See* Third Remand Determination at 22 (finding that the "record cannot support any conclusion on how prices were established during [the Subsequent P]eriod, including a conclusion that prices were solely the result of marketplace forces.").

The court has held previously that the "ITC cannot, using [an] adverse inference [], invent a price-fixing conspiracy during the period outside the time period during which the [C]conspiracy was and was not found to be in effect . . . ." *Elkem V*, 27 CIT at __, 276 F. Supp. 2d at 1315.  Each remand since *Elkem V* has instructed the ITC to "set forth the evidentiary basis for the adverse inference that the price-fixing [C]onspiracy affected prices throughout the entire Original [Period of Investigation]."  *Id.*, 276 F. Supp. 2d at 1315.

Rather than following the court's instruction, the ITC again uses "the approach of comparing pricing patterns during the Conspiracy Period with those during the Subsequent Period . . .,"[6] to support its conclusion that prices in the Subsequent Period were not set solely by marketplace forces.  Third Remand Determination at 9.  In doing so, the ITC found no "material changes[7] in pricing patterns between the Conspiracy Period and the Subsequent Period that could be attributed to the [C]onspirators changing the manner in which they established prices."  Third Remand Determination at 20.  This finding, together with the court's finding that prices during the Conspiracy Period were distorted by the Conspiracy, led the ITC to conclude that there is no evidence that the prices in the Subsequent Period were not similarly distorted, either by the Conspiracy or some other

---

[6]    The ITC found that "compar[ing] the prices that domestic ferrosilicon producers charged during the latter portion of the Conspiracy Period with the [sic] those charged during the Subsequent Period . . . enable[d it] to examine whether prices for the Subsequent Period solely reflected market forces and represent the prices the producers would have charged during the Subsequent Period . . . ."  Second Remand Determination at 10.

[7]    The ITC's analysis revealed that the "frequency of underselling by the subject imports was 80 percent . . . for the entire Conspiracy Period and 74 percent during the entire Subsequent Period . . . ."  Third Remand Determination at 15. The ITC did not view this six percentage point differential as being significant, particularly because the "difference in underselling frequency between the Conspiracy Period and Subsequent Period is far less than the difference in underselling frequency between either of these periods and the Prior Period." Id.

factor. *Id*.


The first difficulty with this theory is that the ITC's finding of a price distortion during the Conspiracy Period was based on an adverse inference. *See Elkem VI*, 28 CIT at __, slip op. 04-49 at 7. In *Elkem VI*, the court found that substantial evidence supported the ITC's adverse inference that the Conspiracy distorted prices during the Conspiracy Period. *Id*. This distortion, however, was never quantified, as the ITC only "compared the prices of imported ferrosilicon and observed that during the Conspiracy Period, imports of ferrosilicon undersold the domestic product more frequently than in the months preceding . . . the [C]onspiracy." *Elkem V*, 27 CIT at __, 276 F. Supp. 3d at 1311. Based on this comparison, the "court [found] that the evidence . . . fairly support[ed] [the ITC's] conclusions with respect to the effect of the [C]onspiracy during the Conspiracy Period." *Id*. This comparison could be made because prices during the Prior Period reflected market conditions, as "there is no evidence that the [C]onspiracy affected prices prior to its existence." *Elkem VI*, 28 CIT at __, slip op. 04-49 at 15.


Thus, the extent to which prices were affected by the Conspiracy during the Conspiracy Period is unknown. Indeed,

plaintiffs have maintained throughout these proceedings that the Conspiracy had no effect on prices. *See Elkem VII*, 28 CIT at __, slip op. 04-152 at 8; *see also* CCM Compl. ¶ 56 (Oct. 28, 1999). That being the case, a comparison of prices between the Conspiracy Period and the Subsequent Period demonstrates nothing with respect to how prices were set. As counsel for the ITC noted at oral argument prior to the modification of the remand instructions from *Elkem VI*, there would be a decline in prices following the end of the Conspiracy Period because, "other things being equal," the prices would be solely determined by marketplace forces. *Elkem VII*, 28 CIT at __, slip op. 04-152 at 11. That is a valid point, but the ITC has failed to determine if marketplace conditions did remain equal, or changed in some material respect following the Conspiracy Period. In other words, without knowing either the extent of the distortion during the Conspiracy Period or what the market would have determined prices to be during the Subsequent Period, no valid comparison can be made.

This approach is further flawed in that the ITC "lack[s] reliable information for the Conspiracy Period, or for the full period of investigation . . . [which] impairs [its] ability to assess the significance of changes, such as those in subject

import volume, between the Conspiracy Period and the Subsequent

Period."  Third Remand Determination at 23.  If the ITC does not

know how prices were set in the Conspiracy Period, or how much

effect the price-fixing Conspiracy actually had on the prices

during the Conspiracy Period, the ITC simply cannot use prices

during the Conspiracy Period as a basis of comparison with the

Subsequent Period to make a determination.  Furthermore, if the

ITC does not know what the market conditions were in the

Subsequent Period, the ITC cannot know if the prices were indeed

set by forces other than the market.

   The Commission asserts that compelling it to ignore

plaintiffs' misconduct and render a determination in plaintiffs'

favor "would subvert a principal justification of the BIA rule,

which is to avoid rewarding the uncooperative and recalcitrant

party for its failure to supply requested information."  Def.'s

Comments at 15 (internal quotation marks omitted).  Nonetheless,

the ITC would substitute a lack of evidence for substantial

evidence.  It is worth noting that the ITC has cited no case

where it has felt itself bound, or required any party to

affirmatively demonstrate that prices were set by the market.

The court's analysis is "not whether we agree with [the ITC's]

conclusions, nor whether we would have come to the same

conclusions reviewing the evidence in the first instance, but

only whether [the ITC's] determinations were reasonable." *See AK Steel Corp. v. United States*, 192 F.3d 1367, 1371 (Fed. Cir. 1999) (citing *U.S. Steel Group v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996)).  Here, it is not reasonable for the court to affirm a determination by the ITC when there is no data tending to confirm a central part of its analysis.  *See Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1374 (Fed. Cir. 2002) (finding that Commission's price determination was not supported by substantial evidence due to inaccurate data). Indeed, "[n]otwithstanding the tolerance of the substantial evidence requirement for Commission determinations which contain some errors, . . . the statutory language of 19 U.S.C. § 1677(7)(B) . . . [does not] permit[] the court to affirm a [determination] which is legally flawed as to each of the three factors the Commission is obliged to consider. . . ."  *Id*. at 1376 (emphasis omitted).

Although the ITC is "not required to amass every conceivable shred of relevant data in order to comply with the requirements of the law, the absence of information necessary for a thorough analysis may render a determination unsupported by substantial evidence."  *Chung Ling Co., Ltd. v. United States*, 16 CIT 636, 640, 805 F. Supp. 45, 49 (1992) (internal citations and quotation

marks omitted).  The court, therefore, cannot agree with the
ITC's conclusion that, based on the lack of available
information, the prices in the Subsequent Period were not solely
determined by marketplace forces.  The argument in the Third
Remand Determination suffers from the same infirmity as the
previous arguments.  Phrasing the conclusion differently does not
alter the result.


CONCLUSION

Based on the foregoing, the court remands the ITC's
conclusion that domestic prices in the Subsequent Period were not
established solely by the marketplace.  On remand, the ITC shall
either (1) reopen the record to obtain relevant data of
marketplace conditions to support, with substantial evidence, its
conclusion that prices in the Subsequent Period were not set by
market forces, or (2) find that the price-fixing Conspiracy was
not a significant factor in the Subsequent Period and further
find that the prices in the Subsequent Period were set by market
forces and complete its analysis accordingly.


Remand results are due on October 19, 2006, comments are due
on November 18, 2006, and replies to such comments are due on
November 29, 2006.  Neither comments nor replies to such comments

shall exceed thirty pages in length.


                                        /s/Richard K. Eaton
                                          Richard K. Eaton

Dated: July 21, 2006
       New York, New York