Slip Op. 08-92

UNITED STATES COURT OF INTERNATIONAL TRADE

_____ :
                                :
ELKEM METALS CO., APPLIED       :
INDUSTRIAL MATERIALS CORP.,     :
AND CC METALS & ALLOYS, INC.,   :
                                :
            Plaintiffs,         :
                                : Before: Richard K. Eaton, Judge
       v.                       :
                                : Consol. Court No. 99-00628
UNITED STATES,                  :
            Defendant.          :
_____ :


OPINION

[United States International Trade Commission's Fourth Remand
Results sustained.]

                              Dated: September 5, 2008

*DLA Piper US, LLP* (*William D. Kramer* and *Clifford E. Stevens,
Jr.*), for plaintiff Elkem Metals Co.

*Arent Fox PLLC* (*George R. Kucik, Eugene J. Meigher, Matthew
Kanna,* and *Kristine J. Dunne*), for plaintiff CC Metals & Alloys,
Inc.

*James M. Lyons*, General Counsel, *Andrea C. Casson*, Assistant
General Counsel, United States International Trade Commission
(*Marc A. Bernstein*), for defendant.

*Greenberg Traurig, LLP* (*Philippe M. Bruno*), for defendant-
intervenors Associacao Brasileira dos Produtores de Ferroligas e
de Silico Metalico, Companhia Brasileira Carbureto De Calcio-
CBCC, Companhia de Ferroligas de Bahia-FERBASA, Nova Era Silicon
S/A, Italmagnesio S/A-Industria e Comercio, Rima Industrial S/A,
and Companhia Ferroligas Minas Gerais-Minasligas.


       Eaton, Judge:  This matter is before the court following

remand to the United States International Trade Commission (the

"ITC" or the "Commission") of its negative injury determination

contained in Ferrosilicon From Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, Invs. Nos. 303-TA-23, 731-TA-566-570, and 731-TA-641 (Final) (Reconsideration) (Fourth Remand) USITC Pub. 3890 (Oct. 2006) ("Fourth Remand Determination").  In the Fourth Remand Determination, the ITC has again found that the United States ferrosilicon industry was neither injured nor threatened with material injury by reason of imports of subject merchandise from foreign companies.[1]

Plaintiffs Elkem Metals Company ("Elkem") and CC Metals and Alloys, Inc. ("CCMA") challenge this determination.  *See* Comments of Elkem on the ITC's Fourth Remand Determination ("Elkem's Comments"); Comments of CCMA on the Fourth Remand Determinations of the ITC ("CCMA's Comments").  Briefs have also been submitted in support of the ITC's findings by the United States on behalf of defendant the ITC and by defendant-intervenors Associacao Brasileira dos Produtores de Ferroligas e de Silico Metalico, Companhia Brasileira Carbureto De Calcio-CBCC, Companhia de Ferroligas de Bahia-FERBASA, Nova Era Silicon S/A, Italmagnesio S/A-Industria e Comercio, Rima Industrial S/A, and Companhia Ferroligas Minas Gerais-Minasligas ("ABRAFE" or "defendant-intervenors").  *See* Def.'s Reply to Pl.'s Comments ("Def.'s

---

[1]     Commissioner Charlotte R. Lane dissented, finding that an industry in the United States was materially injured by reason of imports of subject merchandise.  *See* Fourth Remand Determination (Dissenting Views of Commissioner Lane) at 13.

Reply"); Def.-Ints.'s Resp. to Comments ("Def.-Ints.'s Resp.").

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000)

and 19 U.S.C. § 1516a(a)(2)(B)(ii)(2000).  For the reasons

detailed below, the court sustains the ITC's Fourth Remand

Determination.


                          BACKGROUND

     Familiarity with the facts of this dispute is presumed.  For

purposes of this opinion, however, the following history is

given.  In *Elkem Metals Co. v. United States*, 30 CIT __, 441 F.

Supp. 2d 1292 (2006)("*Elkem VIII*"), the court reviewed the ITC's

third remand determination and considered whether an established

price-fixing conspiracy[2] (the "Conspiracy") was a significant

condition of competition that affected prices charged by United

States ferrosilicon producers during the period of investigation

January 1, 1989 through June 30, 1993 (the "POI").  As it had in

previous opinions, the court divided the POI into three parts:

(1) the period preceding the Conspiracy, i.e., the first three

quarters of 1989 ("Prior Period"); (2) the period of the

Conspiracy itself, i.e., the period from October 1, 1989 through

---

[2]    The conspirators were plaintiffs Elkem, American
Alloys, Inc., and SKW Metals & Alloys, Inc., the predecessor firm
to CCMA (collectively, "Conspirators" or "plaintiffs").  *See*
*Elkem Metals Co. v. United States*, 27 CIT 838, 840, 276 F. Supp.
2d 1296, 1300 (2003).

June 30, 1991 ("Conspiracy Period"); and (3) the period

subsequent to the end of the Conspiracy, i.e., the period from

July 1, 1991 to June 30, 1993 ("Subsequent Period").  *See Elkem*

*VIII*, 30 CIT at __, 441 F. Supp. 2d at 1293-94; *see also Elkem*

*Metals Co. v. United States*, 28 CIT 1087, 1088 n. 1, 342 F. Supp.

2d 1207, 1209 n.1 (2004)("*Elkem VI*").

In an earlier opinion, the court sustained the finding,

based on the use of adverse facts available ("AFA"), that the

Conspiracy was a significant condition of competition that

affected prices during the Conspiracy Period.  *Elkem Metals Co.*

*v. United States*, 27 CIT 838, 276 F. Supp. 2d 1296 (2003)("*Elkem*

*V*").  In addition, in *Elkem VI*, the court "sustain[ed] the ITC's

finding that the price-fixing [C]onspiracy did not affect prices

during the Prior Period"[3] and remanded, as unsupported by

substantial evidence, the Commission's finding that the price-

---

[3]      In *Elkem V*, the court sustained the finding that the
price-fixing Conspiracy was a significant condition of
competition that affected prices during the Conspiracy Period.
*Elkem V*, 27 CIT at 856, 276 F. Supp. 2d at 1313.  Following
remand, the court sustained the ITC's finding that the price-
fixing Conspiracy was not a significant condition of competition
during the Prior Period.  *Elkem VI*, 28 CIT at 1091, 342 F. Supp.
2d at 1212.  Although it found that the Conspiracy was not a
significant condition of competition during the Prior Period, the
ITC concluded that "[t]he available pricing data for the Prior
Period do not detract from [the negative injury determination],
because they show predominant overselling."  Ferrosilicon From
Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, Invs.
Nos. 303-TA-23, 731-TA-566-570, and 731-TA-641 (Final)
(Reconsideration) (Second Remand), USITC Pub. 3627 at 9 (Sept.
2003) (footnote omitted).

fixing Conspiracy affected prices during the Subsequent Period.
*See Elkem VI*, 28 CIT at 1091, 342 F. Supp. 2d at 1212.

Thereafter, the ITC issued its third remand determination,
again making a negative injury determination.  In its third
remand determination, the Commission redirected its efforts to
address Elkem's assertion that, "absent evidence to the contrary,
the Commission should presume that ferrosilicon prices during the
Subsequent Period were established pursuant to marketplace forces
because ferrosilicon is a commodity product sold by numerous
suppliers pursuant to competitive bidding."  Ferrosilicon From
Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, Invs.
Nos. 303-TA-23, 731-TA-566-570, and 731-TA-641 (Final)
(Reconsideration) (Third Remand), USITC Pub. 3765 at 9 (Mar.
2005) ("Third Remand Determination") (footnote omitted).  In
response, the Commission stated:

> [W]e have not attempted to make an affirmative showing
> that the [C]onspiracy affected prices during the
> Subsequent Period.  To comply with the CIT's decision,
> our finding instead concentrates solely on what the
> record does *not* show – namely, that prices during the
> Subsequent Period were established in a different
> manner, i.e., solely pursuant to marketplace forces,
> than prices for the Conspiracy Period.

Third Remand Determination at 19 (emphasis in original).  Rather,
in the Third Remand Determination, the ITC applied adverse
inferences to the Subsequent Period.  *Id*. at 20.

In *Elkem VIII*, the court reviewed the Third Remand

Determination and found that "substantial evidence [did] not support the ITC's adverse inference that the price-fixing [C]onspiracy affected prices outside the Conspiracy Period [,i.e., during the Subsequent Period]." *Elkem VIII,* 30 CIT at ___, 441 F. Supp.2d at 1299 (citation omitted).  The court explained that the ITC did not have evidence as to the market conditions in the Conspiracy Period (October 1, 1989 to June 30, 1991) or the Subsequent Period (July 1, 1991 to June 30, 1993).  In reaching its finding, the court explained that the ITC could not merely compare prices between the Conspiracy Period and the Subsequent Period and reach a valid conclusion as to how prices were set:

> [T]he ITC has failed to determine if marketplace conditions did remain equal, or changed in some material respect following the Conspiracy Period.  In other words, without knowing either the extent of the distortion during the Conspiracy Period or what the market would have determined prices to be during the Subsequent Period, no valid comparison can be made.

*Elkem VIII,* 30 CIT at ___, 441 F. Supp.2d at 1300.  Therefore, the court was unable to "agree with the ITC's conclusion that, based on the lack of available information, the prices in the Subsequent Period were not solely determined by marketplace forces."  *Elkem VIII*, 30 CIT at __, 441 F. Supp. 2d at 1301.

The court also addressed the ITC's finding that the existence of the Conspiracy allowed the taking of an adverse

inference with respect to the Subsequent Period.  *Elkem VIII,* 30 CIT at ___, 441 F. Supp. 2d at 1299.  Specifically, the court found that if an adverse inference were to be applied, it must be supported by substantial evidence.  Because there was no evidence that the Conspiracy lasted beyond the Conspiracy Period, such evidence was absent from the Subsequent Period.  As a result, the court remanded the ITC's conclusion that domestic prices in the Subsequent Period were not established solely by the marketplace. *Elkem VIII*, 30 CIT at ___, 441 F. Supp. 2d at 1301.  Put another way, the court required that on remand the ITC support, with substantial evidence, the conclusion that the Conspiracy affected prices during the Subsequent Period, or conclude that domestic prices were set pursuant to market forces.

The court thus remanded with instructions for the Commission to support its findings with substantial evidence.  In doing so, the ITC was ordered to

> either (1) reopen the record to obtain
> relevant data of marketplace conditions to
> support, with substantial evidence, its
> conclusion that prices in the Subsequent
> Period were not set by market forces, or (2)
> find that the price-fixing Conspiracy was not
> a significant factor in the Subsequent Period
> and further find that the prices in the
> Subsequent Period were set by market forces
> and complete its analysis accordingly.

*Elkem VIII*, 30 CIT at ___, 441 F. Supp. 2d at 1301.

The ITC has now issued its Fourth Remand Determination,

again making a negative injury determination.  In reaching its

determination, the ITC chose not to reopen the record of this

proceeding.[4]  Instead, in accordance with the court's remand

instructions, the Commission found that the price-fixing

Conspiracy was not a significant condition of competition that

affected prices during the Subsequent Period, and that the prices

in the Subsequent Period were set by market forces.  The ITC then

performed an analysis, making findings as to volume, price

effects, and industry impact.  As to the steps it took to reach

its final determination, the court finds that the ITC followed

the remand instructions in *Elkem VIII* in its Fourth Remand

Determination.

As noted, the Commission's revised analysis continues to

find no material injury to the domestic ferrosilicon industry

---

[4]      The ITC stated that it "declined to reopen the record
of this remand proceeding for many of the same reasons that we
declined to reopen the record of the third remand proceeding."
Fourth Remand Determination at 4.  First, it stated, in the
original investigation the Conspirators gave questionnaire
responses that were not truthful and on the first remand
submitted information that was not probative. *Id*.  Second, the
ITC declined to reopen the record because "even if CCMA and Elkem
were inclined to cooperate with additional information requests,
the requests would concern pricing decisions made from 1989 to
1991.  The likelihood of now obtaining complete and accurate
information about transactions that took place 15 to 17 years ago
is dubious at best." *Id*. at 5.  Accordingly, the ITC continued to
rely on data collected during the original investigation. *Id*.
Nowhere in their papers do the plaintiffs object to the ITC's
decision not to reopen the record.

from the subject imports.[5]  Fourth Remand Determination at 5.


STANDARD OF REVIEW

When reviewing the ITC's final injury determination in an antidumping investigation, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).


DISCUSSION

I.   Introduction

Prior litigation in this case centered on the appropriate use of evidence in light of the price-fixing Conspiracy.  The Conspiracy, which was in place from October 1989 through June of 1991 among three major domestic ferrosilicon producers, was designed to maintain floor prices of commodity ferrosilicon. *See* Fourth Remand Determination at 2 n. 13; *Elkem VI*, 28 CIT at 1087, 342 F. Supp. 2d at 1209.  As a result of the Conspiracy, some

---

[5]      In addition, the ITC reaffirmed its findings as to definitions of like product and domestic industry, and findings on cumulation, none of which were at issue in the litigation before this court.  Fourth Remand Determination at 5 n. 35. Likewise, the ITC again adopted the threat analysis it had previously used, namely, that threat of material injury is not at issue here.  *Id*.  Because no objection has been raised to these findings, they are not addressed here.

evidence presented to the ITC was tainted by obstruction and misrepresentation.  The misrepresentations were directly tied to twenty-one months of the original four and a half year period of investigation.  Previously, the ITC tried various ways of taking the Conspiracy into account.

Now, in its Fourth Remand Determination, the ITC has looked at each year of the POI, both separately and as part of the POI as a whole, in order to incorporate the Conspiracy Period in its review.  Thus, for the Conspiracy Period only, where the court has previously found that the tainted evidence allowed adverse inferences to be applied, the ITC has applied them.  In the other two periods, where no proof existed of tainted evidence, the ITC has provided an analysis using record evidence.

The primary dispute between the parties concerns the ITC's claim that in making its analysis it must take into consideration all three periods.  That is, the ITC insists that in making its material injury determination under 19 U.S.C. § 1673d(b)(1)(A)(i) it must look at the entire POI, including the Conspiracy Period, and use the evidence or lack of evidence accordingly.  Thus, if, using AFA, the evidence during the Conspiracy Period indicates that no domestic injury was caused by the importation of subject merchandise, the ITC claims that such evidence should be taken into account.

Plaintiffs insist that the data from the Prior and

Subsequent Periods must be examined without regard to the impact of the Conspiracy on it.  Plaintiffs take this position even though the Conspiracy Period was a substantial portion of the POI.  For instance, they would compare data from 1989 to 1993 without accounting for the impact of the intervening Conspiracy on that evidence.  At its core, the analysis urged by plaintiffs would have the court ignore any injury, or lack thereof, experienced during the Conspiracy Period, and any effect the Conspiracy had, or could have been found to have, on the volume, price effects, and impact of the subject imports.

II.  The ITC's Finding of No Material Injury By Reason of Subject Imports

A.   The ITC's Use of Data from the Conspiracy Period

As described above, the ITC sets out its material injury determination based on the entire POI, including the Conspiracy Period.  The ITC contends that the Conspiracy Period, encompassing twenty-one months of the POI (October 1989 through June 1991), was "too long in duration to be ignored."  Fourth Remand Determination at 6.  The Commission also argues that "eliminating the Conspiracy Period from our period of investigation would have the undesired effect of rewarding interested parties for their actions impeding the Commission's original investigations."  Fourth Remand Determination at 6 n.

37.

Plaintiffs claim that the ITC must limit its analysis solely to the Subsequent Period or to the Prior and Subsequent Periods. CCMA's Comments 13; Elkem's Comments 5,8. Elkem states: "The [C]onspiracy cannot explain the injury to the domestic industry during the last two years of the POI, when the [C]onspiracy did not exist and the ITC has found that prices were set by market forces." Elkem's Comments 8 (citation omitted). In sum, plaintiffs argue that the ITC should not consider information regarding the Conspiracy Period in its analysis, but rather, should review data from the Prior and Subsequent Periods, or from the Subsequent Period alone. *See* Def.'s Reply 10 (citing CCMA's Comments 13, Elkem's Comments 5, 8).

The court cannot credit plaintiffs' arguments. In *Elkem VIII,* no limitation was placed on the POI, i.e., restricting it to the Prior and Subsequent Period or solely Subsequent Period. *Elkem VIII,* 30 CIT at __, 441 F. Supp. 2d at 1299. The ITC applied adverse inferences to the Conspiracy Period, but only to the Conspiracy Period, where evidence of the Conspiracy supported such use.[6] *See Elkem V,* 27 CIT at 853, 276 F. Supp. 2d at 1310

---

[6] Plaintiff CCMA's argument that the findings concerning the Conspiracy Period are unsupported by substantial evidence is unavailing as it merely attempts to cover again well-worn territory. This court has explicitly found that the ITC is entitled to use adverse inferences solely for the Conspiracy Period. *See Elkem V*, 27 CIT at 853, 276 F. Supp. 2d at 1313.

("The court finds the ITC's use of adverse inferences, for the Conspiracy Period, to be in accordance with law.").  Plaintiffs have simply made no valid argument for not taking into account the twenty-one months of the Conspiracy Period out of a four and a half year investigation.  *See* Fourth Remand Determination at 6. The court thus sustains the ITC's treatment of the data from the Conspiracy Period.


B.    The ITC's Analysis

In a material injury inquiry, the Commission must evaluate the significance of the volume, price effects, and impact of the subject imports.  19 U.S.C. § 1677(7)(C).  When the Commission makes an affirmative material injury determination, it must also find that the material injury to the domestic industry is "by reason of" the subject imports. *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 719-720 (Fed. Cir. 1997) ("*Gerald Metals*").

Here, the ITC analyzed the volume, price effects, and impact of the subject imports, finding none of them to be significant. Moreover, the ITC found that, while conditions in the domestic industry declined during the POI, there is present on the record no substantial evidence that these declines were caused by the subject imports.

1.    Volume of Subject Imports

When evaluating the volume of imports of subject merchandise

for purposes of making a material injury determination, the ITC

considers "whether the volume of imports of the merchandise, or

any increase in that volume, either in absolute terms or relative

to production or consumption in the United States, is

significant."  19 U.S.C. § 1677(7)(C)(i); *Am. Bearing Mfrs.*

*Ass'n. v. United States*, 28 CIT 1698, 1700, 350 F. Supp. 2d 1100,

1104 (2004).  "[I]t is the *significance* of a quantity of imports,

and not absolute volume alone, that must guide ITC's analysis

under section 1677(7)."  *USX Corp. v. United States*, 11 CIT 82,

85, 655 F. Supp. 487, 490 (1987) (citation omitted).

In its volume determination, the ITC reviewed the POI as a

whole as well as separately by year, and found that the record

established increases in subject import volume and market

penetration during 1990 and 1992 but not 1991.[7]  Fourth Remand

Determination at 7.  Of the full years' data examined by the ITC,

_____

[7]      The ITC states that it did not "place principal
reliance on [1993] data in analyzing the significance of subject
import volume" for three reasons.  Fourth Remand Determination at
7.  First, because of its past "reluctance to rely on data that
do not cover a full calendar year." *Id*. at 7 n. 47 (citation
omitted).  Second, because "the interim 1993 data . . . do not
encompass a period for which we have comparable pricing data, as
explained below."  *Id*.  Finally, "import volumes from some
subject sources during interim 1993 may have been negatively
affected by the pendency of the first set of investigations,
which were initiated in May 1992."  *Id*.

one year, 1990, falls within the Conspiracy Period.  As a result,
the ITC found the 1990 increase in subject imports not
significant because, according to the Commission, the increase
resulted from the domestic producers' price-fixing during the
Conspiracy Period.  Fourth Remand Determination at 7.
Specifically, the ITC found that the Conspiracy affected domestic
ferrosilicon prices during the Conspiracy Period, from October 1,
1989 through June 30, 1991:  "[B]ecause of the effects of the
[C]onspiracy, domestic producers were charging higher prices than
market conditions warranted, providing opportunities for the
subject imports to increase their sales in the U.S. market.  This
conclusion is still valid with respect to the Conspiracy Period,
and explains why the 1990 increase in subject imports was not
significant."  Fourth Remand Determination at 7 (footnote
omitted).  Because "the subject imports and the domestic like
product were good substitutes, the increases in volume and market
penetration of subject imports that occurred during the
Conspiracy Period were the result of domestic production not
being priced at marketplace levels." *Id*.  Thus, the ITC found,
the 1990 increase in volume resulted from the actions of the
domestic producers themselves and could not be considered
significant, when viewing it in the context of the condition of
the industry.

    As previously stated, the ITC did not find an increase in

subject import volume during the year 1991.  The ITC did,

however, find that there was an increase in 1992, but concluded

that this increase was not significant.  The ITC explains, "We

emphasize that, in the circumstances of this proceeding, we do

not find a simple year-by-year comparison of subject import

volumes to be analytically useful."  Fourth Remand Determination

at 7.

> Because 1992 is the first year during the
> period of investigation in which the domestic
> industry established prices based on
> marketplace competition throughout the entire
> calendar year, 1992 is not comparable to any
> preceding year in the period of
> investigation.

*Id*. at 7.  Put another way, it is the ITC's position that it

could not compare market-driven import volume in 1992 to prior

years (i.e., the Conspiracy Period) when higher domestic pricing,

not set by the market, allowed for greater market penetration of

subject imports.

     Plaintiffs object to the Commission's volume finding,

stating that it ignores the contrary record evidence

demonstrating a significant increase in volume:

> (1) the cumulated subject imports increased
> in volume from 68,481 short tons ("ST") in
> 1989 to at least 115,190 ST in 1992, an
> increase in volume of 68 percent when demand
> (the size of the total U.S. market) had
> decreased by 10.9 percent: [sic]
>
> (2) the volume of subject imports in 1992
> alone (after the [C]onspiracy ended) was 52.1

> percent higher than in 1991 [during the
> Conspiracy Period] . . . .

Elkem's Comments 4 (citations and footnote omitted); *see also*
CCMA's Comments 14.

The ITC responds that plaintiffs' analysis cites data from
1989 and 1992 without appropriate treatment of the twenty-one
months of the Conspiracy Period.  In other words, according to
the Commission, plaintiffs would have the court (1) direct a
comparison of the 1989 data with the 1992 data without taking
into account the intervening years and (2) direct a comparison of
the 1992 data to the 1991 data even though no valid conclusion
can be drawn from the 1991 data because of the Conspiracy.[8]

The court finds that the ITC has supported its findings with
substantial evidence, i.e., "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion."  *Huaiyin Foreign Trade Corp.* (30) *v. United States*,
322 F.3d 1369, 1374 (Fed. Cir. 2003).  When making a
determination with respect to the significance of any increase in
volume of imported merchandise, the ITC must consider the
probative value of the evidence before it.  "It is within the
Commission's discretion to make reasonable interpretations of the

---

[8]     As noted previously, Elkem argues that the ITC should
base its determination solely on the Subsequent Period, while
CCMA argues for an analysis based on the Prior and Subsequent
periods.  Elkem's Comments 5, 8; CCMA's 13.

evidence and to determine the overall significance of any particular factor or piece of evidence." *See Am. Bearing Mfrs. Inc. Ass'n v. United States*, 28 CIT at 1707, 350 F. Supp. 2d at 1110 (quoting *Me. Potato Council v. United States*, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985); *United States Steel Group v. United States*, 96 F. 3d 1352, 1357 (Fed. Cir. 1996) (the "decision about what weight to give a particular piece of evidence is 'at the core of the evaluative process'")). This discretion is not, of course, unlimited "but must be exercised in a manner consistent with underlying objective of [the statute]-to obtain the most accurate dumping margins possible." *Zhejiang Native Produce and Animal By-Products Imp. & Exp. Group v. United States*, 32 CIT __, __, Slip Op. 08-88 at 17 (June 16, 2008) (not reported in Federal Supplement) (citation omitted).

Here, the ITC looked to the record and found little evidence indicating a significant volume increase. This was because: the 1990 data were tainted by the Conspiracy; it could find no volume increase in 1991; and, 1992 was the first full year when prices were set by the market. With respect to 1992, the ITC found that its 1992 data could not be compared to prior years in the POI because there was no reliable prior year to compare it to. In addition, the ITC found that there was no usable data for the intervening twenty-one months of the Conspiracy Period, precluding the ability to ascertain the basis for a volume

increase from 1989 to 1992.  Thus, the Commission has given a

reasonable explanation for not finding a significant volume

increase during the POI based on an assessment of data for the

years 1990, 1991 and 1992.

In addition, despite plaintiffs' arguments, the court finds

that the ITC appropriately took the unusual circumstances of the

POI into account when declining to compare 1992 data with the

years prior to the Conspiracy Period.  The case of *Angus Chemical*

*Co. v. United States*, 20 CIT 1255, 1259, 944 F. Supp. 943, 948

(1996) ("*Angus*"), is instructive.  In that case, the Court upheld

the ITC's finding that a mechanical comparison of 1990 and 1993

data would "distort" its analysis because of the multiple

"intervening factors" that occurred in the domestic industry

during that period.  Specifically, in mid-1992 one of only two

domestic producers in the industry significantly changed the

market dynamics by leaving the industry.  Purchasers of the

subject merchandise were thus obliged to turn to foreign imports

as an alternative, supplemental source.  Moreover, during the

period there was an explosion at the remaining domestic

producer's facility disrupting industry production.

Therefore, the *Angus* Court found, a simple comparison of the

data between 1990 and 1993 would be "aberrational."  *Angus*, 20

CIT at 1259, 944 F. Supp. at 948.  In reaching its holding, the

reviewing Court upheld the Commission's decision to take these

"unusual circumstances into account when formulating its determination, and its decision to focus on 1993 data and make only limited comparisons between 1990 and 1993 data fell well within its discretion."  *Id*. (citing *Kenda Rubber Indus. Co. v. United States*, 10 CIT 120, 127, 630 F. Supp. 354, 359 (1986) (finding Commission has "discretion to examine a period that most reasonably allows it to determine" injury)).

Similarly, here, the Conspiracy was an intervening factor that precluded comparison between the 1992 data and the data from the immediately preceding years.  Because 1992 was the first year following the Conspiracy in which the market drove pricing, and thus the first year that subject import volume could be assessed without regard to artificially high prices, the ITC could not compare 1992 to the years that preceded it.  Any comparison of the data would be "aberrational."  Accordingly, it was reasonable for the ITC to avoid a mechanical comparison between the data from 1992 and prior years.  The court therefore upholds the ITC's finding that any increase in volume during the POI was not significant.


        2.   Price Effects of Subject Imports

In evaluating the effect of subject imports on price in making a material injury determination, the ITC considers whether

        (I) there has been significant price

underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

With respect to the price effects of subject imports, the ITC states that it was prevented from examining usable underselling data from the Conspiracy Period because the data were not probative, a finding sustained in *Elkem V*.[9]  *Elkem V*, 27 CIT at 853-54, 276 F. Supp. 2d at 1310-11.  The Commission

---

[9]     The court finds the ITC's use of adverse inferences, for the Conspiracy Period, to be in accordance with law. . . . [T]he ITC properly determined that Conspirators' failure to reveal the price-fixing [C]onspiracy significantly impeded the investigation.  This failure serves as a basis for the use of BIA, and as a valid justification for the taking of adverse inferences.  In addition, the adverse inference taken here, i.e., that the underselling and negative price effects experienced by the domestic industry were a product of the domestic producers' own actions, conforms with the rationale behind the adverse inference rule— when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to that party.

*Elkem V*, 27 CIT at 853-54, 276 F. Supp. 2d at 1310-11 (citations and quotation omitted).

explains:

> the domestic producers' own efforts to
> establish a floor price and thereby raise
> domestic prices above market levels undermine
> the significance of the observed
> underselling.  Similarly, the domestic
> producers' [C]onspiracy to maintain floor
> prices undermines the Commission's findings
> [in the 1999 final results] regarding the
> significance of sales and revenues lost by
> the domestic industry to lower-priced subject
> imports.

Fourth Remand Determination at 8 (citation and quotation omitted).  In other words, for the Commission, any underselling seen during the Conspiracy Period can be attributed to the artificially high prices set by the domestic producers.  As a result, the ITC does not include the underselling data from the Conspiracy Period in its analysis.[10]

The ITC does, however, review underselling data from the

---

[10]    CCMA argues that the ITC should not disregard the underselling data from the Conspiracy Period because the court did not require the agency to modify the underselling analysis the ITC used in its original investigation.  CCMA states that the court's "affirmance of the unquantified Conspiracy Period price distortion finding neither required, nor even suggested, that the ITC disregard all evidence of underselling during that period." CCMA's Comments 9.  Despite CCMA's contention, however, the court ruled in *Elkem Metals Co. v. United States,* 26 CIT 234, 240, 193 F. Supp. 2d 1314, 1321 (2002), that the ITC had authority to reconsider its final affirmative material injury determination, including the data upon which it was based.  The underselling data from the Conspiracy Period was a basis for the ITC's original affirmative injury finding.  Accordingly, in reexamining its final determination, the ITC had the authority to reconsider the underselling data from the Conspiracy Period and eliminate that data from its analysis in the Fourth Remand.

Prior and Subsequent Periods.  With respect to that data, the

Commission finds "[u]sable underselling observations from the

Prior Period and the Subsequent Period account for only about

one-third of all price comparisons during the entire period for

which we have consistently-generated pricing data."  Fourth

Remand Determination at 8 (footnote omitted).  Put another way,

the remainder of the underselling data was from the Conspiracy

Period.

     The ITC states:

> The pricing data to which we refer in this
> opinion were collected on a quarterly basis
> from January 1989 through September 1992.
> While some pricing data were collected for
> the fourth quarter of 1992 and the first two
> quarters of 1993 in the original
> investigations, it is not entirely comparable
> to the earlier data due to differing
> specifications and response coverage.  We
> consequently have not relied on this latter
> data in our prior remand determinations, and
> do not do so here.

Fourth Remand Determination at 8 n. 52 (citation omitted).

     Based primarily on the unreliability of the pricing data on

the record for much of the POI, the ITC concludes, "We cannot

find this incidence of underselling, which is not pervasive

underselling, over the entire period of investigation to be

significant."  Fourth Remand Determination at 8.  That is, the

ITC found that the record did not contain substantial evidence of

"significant price underselling."  The Commission explains:

> With respect to those countries cumulated for
> purposes of the determinations with respect
> to subject imports from Russia and Venezuela,
> there were 64 quarterly pricing comparisons
> during the period through the third quarter
> of 1992 [January 1989 through September 1992]
> for which we have comparable pricing data,
> and at most 21 usable underselling
> observations.  With respect to those
> countries cumulated for purposes of the
> determinations with respect to subject
> imports from China, Kazakhstan, and Ukraine,
> there were 75 quarterly pricing comparisons
> during the period for which we have
> comparable pricing data [January 1989 through
> September 1992], and at most 25 usable
> underselling observations.  With respect to
> the determination on subject imports from
> Brazil, there were 15 quarterly pricing
> comparisons during the period for which we
> have comparable pricing data [January 1989
> through September 1992], and at most five
> usable underselling observations.

Fourth Remand Determination at 8 n. 54 (citations omitted). Thus, according to the ITC, most of the data collected in this time frame comes from the Conspiracy Period and is unusable, and the usable data does not provide sufficient evidence of pervasive underselling.

With respect to the remaining two periods, the ITC found, in its second remand determination, that there was predominant overselling of subject imports during the Prior Period, i.e., the first three quarters of 1989. Ferrosilicon From Brazil, China, Kazakhstan, Russia, Ukraine, and Venezuela, Invs. Nos. 303-TA-23, 731-TA-566-570, and 731-TA-641 (Final) (Reconsideration) (Second Remand), USITC Pub. 3627 at 9 (Sept. 2003) ("Second Remand

Determination").

     The ITC did review data for the Subsequent Period, finding

no

          significant correlation between the observed
          underselling and the domestic shipment trends
          for the products on which pricing data were
          collected.  This is pertinent to the question
          of whether underselling during this period
          caused purchasers to switch from the domestic
          like product to the subject imports.  There
          were numerous instances in which domestic
          shipment volumes of a product increased on a
          quarterly basis notwithstanding the existence
          of underselling.[11]  By contrast, during all

_____

[11]     For example, subject imports from Argentina,
         China and Venezuela of product 1 sold to
         steel producers undersold the domestic like
         product during the fourth quarter of 1991.
         Imports from China and Venezuela accounted
         for [a majority] of total sales of product 1
         from subject sources to steel producers
         during that quarter.  Nevertheless, domestic
         producers' shipments of product 1 to steel
         producers increased from the third to the
         fourth quarters of 1991.

         Similarly, the two subject sources that sold
         product 2 to steel producers during the
         fourth quarter of 1991, Kazakhstan and
         Ukraine, both undersold the domestic like
         product.  Domestic producers' shipment of
         product 2 to steel producers also increased
         from the third to the fourth quarters of
         1991.

         During the second quarter of 1992, subject
         imports from Brazil, China, and Venezuela of
         product 1 to steel producers each undersold
         the domestic like product.  Domestic
         producers' shipments of product 1 to steel
         producers increased from the first to the
         second quarters of 1992.

quarters in 1991 and 1992 for which there are
comparable pricing data, the largest declines
in total domestic shipments of pricing
products [sic] on a quarterly basis occurred
during the first half of 1991, which was
within the Conspiracy Period.

Fourth Remand Determination at 9 (footnotes omitted).  In other

words, during the Subsequent Period the ITC found no evidence

that the observed underselling took away business from domestic

producers, i.e., caused injury to the domestic industry, although

there appears to have been injury to domestic producers during

the Conspiracy Period.  As for the Conspiracy Period, the ITC

concludes that the declines in domestic shipments can be presumed

to have resulted from the artificially high prices set by the

domestic producers.  The ITC therefore does not find the observed

underselling to be significant, because it caused no injury that

was not self-inflicted.

In addition, the Commission restated the finding from its

first remand opinion that the subject imports did not have

significant price-suppressing or price-depressing effects during

the POI.[12]  Fourth Remand Determination at 9.  With respect to

_____

Fourth Remand Determination at 9 n. 57 (citations omitted).

[12]    The Commission notes that it has no cause to revisit or
reconsider the finding that the subject imports did not have
significant price-suppressing or price-depressing effects during
the POI:

In the first remand opinion, the Commission
found that to the extent prices charged by

the Subsequent Period alone, the Commission, in fact, sees a

price *increase* over the course of 1992, despite underselling and

increasing subject import volumes:

> We nevertheless observe that an analysis of
> pertinent data for 1992 reinforces our
> finding that the subject imports did not have
> significant price-depressing or -suppressing
> effects.  Notwithstanding underselling and
> increasing subject import volumes during
> 1992, the domestic industry was able to
> increase prices during that year.  For each
> of the two pricing products for which there
> was competition from subject imports, prices

---

> the domestic industry were a function of
> market forces, price changes during the
> original period of investigation reflected
> changes in demand and the nature of the
> ferrosilicon process.  The Commission
> consequently concluded that the subject
> imports did not have significant price-
> suppressing or -depressing effects.  The CIT
> affirmed this finding in *Elkem V*.  The
> Commission's finding proceeded from the
> premise that prices were established pursuant
> to marketplace conditions and consequently
> was not based on an adverse inference.  The
> CIT's action upholding the finding, which
> included the finding for 1992, similarly was
> not premised on the Commission's ability to
> take adverse inferences to the Conspiracy
> Period.  Consequently, as a legal matter,
> *Elkem VIII* does not require that we
> reconsider or modify this finding.

Fourth Remand Determination at 9 (citations omitted).  The court
agrees that this finding does not have to be revisited or
modified, because it was based on the ITC's review of the
evidence and not on an adverse inference.  Had it been based on
an adverse inference with respect to the Subsequent Period, the
remand instruction in *Elkem VIII* would have required the
Commission to revisit its finding. *Elkem VIII*, 30 CIT at ___, 441
F. Supp. 2d at 1301.

> were higher in the third quarter of 1992 than in the first quarter of that year.  The increased prices were not a reflection of increased costs; on a unit basis, the domestic industry's cost of goods sold declined during 1992.  Moreover, while domestic producers' prices for product 2 to iron foundries declined during 1992, there were no reported imports from subject sources of this pricing product during that year. The 1992 data therefore underscore that the subject imports were not driving movements in prices for the domestic like product.

Fourth Remand Determination at 10 (citations omitted).  Thus, with respect to the 1992 data, the ITC did not find evidence that the subject imports had an adverse impact on prices of the domestic like product.  Accordingly, based on its examination of pricing data for the Prior and Subsequent Periods, the ITC did not find that the subject imports adversely impacted prices for domestic like products during the POI.

Plaintiffs argue that record evidence supports an affirmative determination because between 1989 and 1992 average unit values declined, pulling prices downward.  *See* Elkem Comments 4 (stating that "the average unit value of the subject imports fell by a massive 46.5 percent between 1989 and 1992, pulling down the prices of . . . U.S.-produced ferrosilicon")(citation omitted)*; see also* CCMA's Comments 14. The ITC contends, however, that in seizing upon this single observation, plaintiffs fail to take into account the existence of the Conspiracy Period (October 1989 through June 1991).  *See*

Def.'s Reply 10-11. For the Commission, the presumed artificially high prices during this period can reasonably be assumed to have had some influence on the market.  Thus, for the Commission, it is not enough to show evidence of a price decline from before the Conspiracy Period to after the Conspiracy Period, but rather, there must also be evidence that the subject imports, and not another cause such as the Conspiracy, *caused* any price decline.

The court agrees with the Commission that plaintiffs have not demonstrated (1) that there was pervasive underselling during the POI, (2) that observed underselling during the Subsequent Period was significant, or (3) that subject imports had significant price-suppressing or price-depressing effects during the Subsequent Period or the entire POI.  The court reaches this conclusion notwithstanding plaintiffs' view that examining the record evidence without considering the impact of the Conspiracy Period would result in a different finding.  *See* Elkem's Comments 5 (stating that "the most probative period for this analysis is the two years after the end of the [C]onspiracy").

There is substantial evidence to support the Commission's findings.  Specifically, the underselling seen during the Conspiracy Period is best attributed to the artificially high prices set by the domestic producers.  Moreover, the usable data on incidences of observed underselling in the Prior and Subsequent Periods account for only about one-third of all price

comparisons, and thus the Commission was reasonable in reaching the conclusion that these comparisons did not show pervasive underselling.  This is particularly the case because of the overselling demonstrated during the Prior Period.  Thus, it was reasonable to find that underselling was not pervasive over the entire POI.

In addition, data show that underselling occurred during the same time periods as domestic shipment volumes increased, meaning that there is no evidence that observed underselling in the Subsequent Period took business away from domestic producers. Finally, the evidence reveals that there was a price increase during the Subsequent Period despite underselling and increasing subject import volume and that the increase was not caused by increased costs.  Thus, the ITC's findings as to price effects are supported by substantial evidence and are sustained.  "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) ("*Ceramica Regiomontana*").

C.    Impact of Subject Imports on the Domestic Industry

To examine the impact of subject imports on the domestic

industry, in making a material injury determination, the ITC

evaluates

all relevant economic factors which have a bearing on
the state of the industry in the United States,
including, but not limited to——

(I) actual and potential decline in output,
sales, market share, profits, productivity,
return on investments, and utilization of
capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects
on cash flow, inventories, employment, wages,
growth, ability to raise capital, and
investment,

(IV) actual and potential negative effects on
the existing development and production
efforts of the domestic industry, including
efforts to develop a derivative or more
advanced version of the domestic like
product, and

(V) in a proceeding under part II of this
subtitle, the magnitude of the margin of
dumping.

The Commission shall evaluate all relevant economic
factors described in this clause within the context of
the business cycle and conditions of competition that
are distinctive to the affected industry.

19 U.S.C. § 1677(7)(C)(iii).

The ITC found that any overall declines in industry

performance during the POI "were largely a function of declines

that occurred during the Conspiracy Period" (October 1989 through

June 1991), and accordingly, cannot be attributed to the subject
imports.  Fourth Remand Determination at 10.  The Commission
reached this conclusion following its review of the record which
it claims shows declines in the domestic ferrosilicon industry's
output, employment, and operating performance between 1989 and
1992.  *Id.* ("The most severe declines in output and employment
occurred in 1990 and 1991, and the most severe declines in
operating performance occurred in 1990.") (footnote omitted).
Thus, according to the ITC the most severe declines took place
while the Conspiracy was in existence.

In addition, the Commission again notes that it found no
significant volume or price effects during the POI, and further
notes that the decline in industry performance during the
Subsequent Period appears unconnected to the subject imports:

> First, we have previously found that, in the
> context of the entire period of
> investigation, the subject imports had no
> significant volume or price effects.  In
> light of this, any declines in domestic
> performance observed during the Subsequent
> Period cannot be attributed to the subject
> imports.
>
> Second, notwithstanding that we have found
> that the effects of the [C]onspiracy on
> prices were limited to the Conspiracy Period,
> the [C]onspiracy still affected the probative
> value of the data in the Commission record
> for all annual periods up to, and including,

1991.[13]  Because the 1991 data are not a
probative baseline for competitive market
conditions, the record permits us to do no
more than observe that during 1992 [beginning
with the Subsequent Period] domestic industry
performance declined concurrently with
increases in subject import volume.
Particularly because there is no basis for a
finding that the increased volume of subject
imports during 1992 had adverse price
effects, we cannot identify any causal link
between the subject imports and the declines
in industry performance.

Fourth Remand Determination at 10 (footnote omitted).  In

examining the subject import increase in 1992 [the Subsequent

Period] in isolation, without comparison to the data from the

Conspiracy Period, the ITC finds that the increase in volume was

"insufficient by itself to support a conclusion that the subject

imports had a significant adverse impact on the domestic

industry."  Fourth Remand Determination at 10-11.  The ITC

explains:

We examined this increase, taking into
account that 1992 was characterized by
declines in domestic industry performance.  A
variance analysis that Commission staff
performed for the original investigations,
however, supports the conclusion that
declines in the domestic industry's sales

---

[13]     The ITC argues that, even though the Conspiracy Period
lasted for twenty-one months ending with the first six months of
1991, the data on impact of subject imports for 1991 is not
probative because such data is collected on an annual basis.  "In
its antidumping and countervailing duty investigations, including
the instant proceedings, the Commission typically collects most
data relating to the impact of subject imports on an annual
basis."  Fourth Remand Determination at 10 n. 66.

> volume did not contribute to its declines in
> operating performance during 1992. Sales
> revenues did decline in 1992 because of lower
> sales quantities and a decrease in unit
> values. The variance analysis, however,
> indicates that this decline was more than
> offset by volume-related reductions in cost
> of goods sold and sales, general, and
> administrative expenses. In other words,
> assuming (as is done for a variance analysis)
> that prices could be held constant, because
> there was a greater decline in the costs
> associated with the lower quantity of sales
> than there was a decrease in sales revenue,
> the change in sales quantities in 1992 had an
> overall positive effect on the domestic
> industry's operating performance. The
> variance analysis indicates that the decline
> in operating performance during 1992 was
> entirely related to changes in the industry's
> prices. As explained above, the price
> declines cannot be a function of the subject
> imports, which did not have significant price
> effects.

Fourth Remand Determination at 11 (footnote omitted).

In their papers, plaintiffs point to contrary record evidence in support of their argument that the subject imports impacted the domestic industry:

> the market share of the subject imports
> increased from 18.2 percent in 1989 to 34.4
> percent in 1992, while the domestic
> industry's market share declined from 66.8 to
> 48.0 percent; [and]
>
> . . .the market share of the subject imports
> in 1992 (after the [C]onspiracy had ended)
> was 10.6 percentage points higher than in
> 1991, accounting for the vast majority of the
> domestic industry's 12.8 percentage points of
> lost market share in 1992 . . . .

Elkem's Comments 4 (citations omitted); *see also* CCMA's Comments

14.

     With respect to this comparison of 1989 to 1992, however,
plaintiffs again compare the effect of the subject imports before
and after the Conspiracy Period without taking into account the
Conspiracy Period itself.  While plaintiffs have pointed to an
increase in market share for subject imports, they have failed to
address the impact of any artificially high prices for
domestically produced goods resulting from the Conspiracy.
Moreover, plaintiffs' chosen evidence would have the court
compare market share in 1992 to market share in 1991 without
considering the Conspiracy's effect on prices.  The Conspiracy
was in effect from January through June of 1991, making the price
data from that time period unreliable as a basis for comparison
with 1992 prices.

     The court finds the preceding analysis by the ITC convincing
and finds that the Commission relied on substantial evidence to
support its conclusions and sufficiently explained the reasoning
behind its conclusions.  *See Ceramica Regiomontana*, 10 CIT at
405, 636 F. Supp. at 966.  Particularly noteworthy is the finding
that "the overall declines in industry performance that occurred
during the original period of investigation were largely a
function of declines that occurred during the Conspiracy Period,"
and that these declines cannot be attributed to the subject
imports.  Fourth Remand Determination at 10.  Rather, the

artificially high prices set during the Conspiracy can be presumed to have provided an opportunity for the subject imports to increase sales in the United States market.  *Id.; see Elkem V*, 27 CIT at 854, 276 F. Supp. 2d at 1310 (affirming the ITC's use of an adverse inference for the Conspiracy Period and stating that "the underselling and negative price effects experienced by the domestic industry were a product of the domestic producers' own actions").

Further, as mentioned, the ITC validly found that the subject imports had no significant volume or price effects, and therefore, any declines in domestic performance during the Subsequent Period cannot be attributed to the subject imports. Fourth Remand Determination at 10.  Finally, the court affirms the ITC's finding that because data from the Conspiracy Period "are not a probative baseline for competitive market conditions," the evidence merely shows that "during 1992 domestic industry performance declined concurrently with increases in subject import volume."  *Id*. at 18.  Given that there is no basis to show that this increased volume had adverse price effects, the ITC supported its finding that "we cannot identify any causal link between the subject imports and the declines in industry performance."  *Id*.

Plaintiffs' insistence on a contrary conclusion does not invalidate the Commission's decision.  Nothing in plaintiffs'

analysis, based as it is on a selective use of the evidence, convinces the court that the ITC has erred.  *See NEC Corp. v. Dep't of Commerce*, 23 CIT 987, 991-92, 83 F. Supp. 2d 1339, 1344 (1999) (quoting *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1008, 33 F. Supp. 2d 1082, 1104 (1998) ("Although Plaintiffs are correct that some of the record evidence could lead to different conclusions, the ITC has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis.")).  Thus, the court sustains the ITC's finding that subject imports did not have a significant adverse impact on the domestic ferrosilicon industry.

D.   Causation

Finally, for material injury to be found, the antidumping statute requires a showing that the injury be "by reason of" the subject imports.  *Gerald Metals*, 132 F.3d at 719-720 (vacating and remanding an affirmative injury determination where decrease in domestic prices was not caused by subject imports but by market forces); 19 U.S.C. § 1677(7)(B)(ii) ("in making determinations [of unfair trade], the Commission, in each case . . . may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.").

With respect to finding a cause for changes in the industry during the POI, Elkem acknowledges that demand did decrease during the POI, but complains that "[a] negative determination is not in accordance with law if some other factor like demand merely contributed to the harm, in addition to harm caused by the subject imports."  Elkem's Comments 8.  Elkem's argument is misplaced.  Here, it is not that a decrease in demand merely contributes to the harm caused by the subject imports.  Rather, the ITC finds no evidence that the subject imports caused any harm at all.

"[A] showing that economic harm to domestic injury occurred when LTFV imports are also on the market is not enough to show that the imports caused a material injury."  *Gerald Metals*, 132 F.3d at 719.  The "anti-dumping statute mandates a showing of causal— not merely temporal— connection between the LTFV goods and the material injury."  *Id*. at 720.

The ITC states that it sought and found no causal connection between increased subject imports and harm to the domestic injury.  Plaintiffs point to no flaw in the evidence relied upon in the ITC's decision making.  Instead, they point to contrary evidence that supports their position but fails to undermine the ITC's findings.  For instance, Elkem claims that the subject imports "inflicted far more than *de minimis* injury on the domestic industry," but, as has been seen, because its analysis

is based on only part of the record, it fails to support with

substantial evidence in the record its contention that subject

imports caused the claimed injury.  Elkem's Comments 11.  In

addition, the ITC is not required, as Elkem asserts (Elkem's

Comments 9), to supply a sufficient alternative cause of decline

in demand:

> There is no statutory requirement that the
> Commission similarly show a causal link
> between nonsubject imports (i.e., imports
> that have not been identified as being sold
> at less than fair value) and material injury.
> Rather, the ITC is permitted to conclude that
> other factors, whether they themselves may be
> said to "cause" injury, certainly undermine
> the notion that dumped imports are a cause of
> injury.

*Altx, Inc. v. United States*, 25 CIT 1100, 1105-06, 167 F. Supp.

2d 1353, 1362 (2001) ("*Altx*").

Nonetheless, the ITC has found that "the overall declines in

industry performance that occurred during the original period of

investigation were largely a function of declines that occurred

during the Conspiracy Period."  Fourth Remand Determination at

10.  Based upon the evidence previously discussed in this

opinion, the ITC can reasonably conclude that the Conspiracy

contributed to any injury.  The Commission's identification of a

factor other than the subject imports, namely, the Conspiracy,

can be said to "cut the causal link," and supports the finding

that the subject imports here did not cause harm to the domestic

industry.  *See Altx*, 25 CIT at 1105-06, 167 F. Supp. 2d at 1362.

Plaintiffs urge an analysis based on a comparison of observations either taken before and after the Conspiracy Period or taken entirely after the Conspiracy Period.  The problem with this analysis is that it ignores not only the tainted Conspiracy Period data, but also any suggestion that the Conspirators' behavior may have contributed to any injury.  Because of this, and because the ITC has supported its conclusions with substantial evidence, the results on remand are sustained.

CONCLUSION

The Commission makes specific findings in its analysis of volume, price effects, and impact, explaining its overall conclusion that the domestic ferrosilicon industry was not materially injured by the subject imports during the period of investigation.  Moreover, the ITC complies with this court's remand instructions in *Elkem VIII.*  The ITC's findings are supported by substantial evidence and in accordance with law. The ITC's findings are sustained.


                                    _____/s/ Richard K. Eaton____

                                        Richard K. Eaton


Dated:     September 5, 2008
           New York, New York